THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLINTON JACKSON, Defendant-Appellant.

First District (4th Division) No. 1—03—1489

Opinion filed June 30, 2005.

REID, P.J., dissenting.

Michael J. Pelletier and Henrik Essunger, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon Malavia, and Colleen M. Nevin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a bench trial, defendant Clinton Jackson was convicted of distributing harmful materials to a minor in violation of section 11—21 of the Criminal Code of 1961 (720 ILCS 5/11—21 (West 2000)) and sentenced to six months in the Cook County Department of Corrections. On appeal, defendant challenges the constitutionality of section 11—21 and argues that the State failed to prove his guilt beyond a reasonable doubt. For the following reasons, we affirm.

## BACKGROUND

The following evidence was adduced at trial. In August 2001, defendant was a staff member at Maryville Academy's Scott Nolan Center (Center) in Des Plaines, Illinois. The Center is part of Illinois's Juvenile Justice Program (JJP). Sixteen-year-old G.B. was one of the Center's youth-residents whom defendant supervised. On the evening of August 4, 2001, as G.B., other youth-residents, and staff members

were watching television in a dayroom at the Center, defendant inserted a videotape labeled "1998 Bulls/Jazz Game 3&4" in the video-cassette recorder (VCR) and pressed the play button. Though he watched the tape for only a couple of seconds, G.B. saw a girl, a couch, and defendant on the tape.

Sometime thereafter, G.B. watched defendant's tape a second time, though he was unsure of the exact date. During this second viewing, both he and defendant were in the dayroom. When G.B. asked defendant what was on the tape, defendant replied, "Check." After pressing the play button on the VCR, G.B. observed defendant and an unknown woman engaged in various sexual acts. The genitalia of both defendant and the woman were clearly visible on the tape. According to G.B., the television audio was kept muted because defendant did not want anyone to know about the tape. G.B. testified that he enjoyed watching the tape.

After watching the tape, G.B. went to his room. On the way, he met staff member Hector Escalera in the hallway. G.B. told Escalera that he had just watched a good movie.

G.B. testified that two or three weeks later, he spoke to Mike Schoenwald, a supervisor at the Center. Brian King, a floor manager at the Center, was also present during this conversation. G.B. told Schoenwald and King that he had seen a sexually explicit videotape and identified defendant as a participant in the sexual activity depicted on that videotape. G.B. also spoke with James Spruyt, the individual who "runs the Center," about having viewed the sexually explicit videotape. G.B. was later taken to the police station, where he told Detective Matt Kulak what he had seen on the tape.

Escalera testified that on August 4, 2001, he was watching a football game while monitoring activity in the hallway at the Center. After hearing "a lot" of excessive noise emanating from the dayroom, Escalera went to investigate, believing that the youth-residents might be arguing or fighting. Instead, he found a group of youth-residents watching television. On several occasions that night, Escalera checked in on the group in the dayroom, but each time he approached the room, someone turned off the television. On the last occasion, Escalera saw G.B. and other youth-residents coming out of the room. When he asked what the commotion was about, a staff member identified as "Christopher" showed Escalera about 30 seconds of the videotape. Escalera did not remember seeing defendant in the dayroom at any point that evening, nor did he discuss the videotape with defendant.

Instead, on August 6, 2001, Escalera reported the incident to Schoenwald. Later that day, as defendant showed the videotape to a

group of adult staff members in the dayroom, Spruyt entered the room, confiscated the tape, and called the police and the child abuse hot line at the Department of Children and Family Services (DCFS). A DCFS investigator subsequently interviewed G.B.

Schoenwald testified that when he confronted defendant about the tape, defendant denied showing it to the youth-residents. However, defendant apologized to Schoenwald for having brought the videotape into the Center.

Spruyt testified that he confiscated the tape once he learned of it. Spruyt stated that defendant was standing next to the videocassette recorder when he confiscated the tape. Defendant told Spruyt he had not shown the tape to any of the youth-residents.

Detective Kulak testified that after speaking to G.B., he called defendant and asked him to come to the police station. Defendant went to the station, but declined to give a statement in the absence of counsel. After Detective Kulak spoke to Spruyt and watched the videotape, he arrested defendant.

At trial, the State played portions of the three-hour videotape for the circuit court, including one scene in which defendant asked the woman to say "This is for my boys at the JJP." The record does not indicate which segments of the tape were shown to the court or whether the portions of the tape that the court observed were the same segments that G.B. had seen while in the dayroom.

Defendant failed to object to the fact that the State did not show the entire tape to the circuit court. Instead, the parties stipulated to the following:

"This particular incident goes on for a while. And then after this scene, there is a scene in a garage in reference to what [G.B.] had said as well, where a girl is put into handcuffs, [and] another girl is displayed. And there is intercourse with that woman as well."

After the State rested and after the circuit court denied defendant's motion for a directed finding, defendant testified on his own behalf. He testified that he had brought the tape, along with several others, to the Center believing it contained the basketball games labeled on the tapes. Defendant explained that after he began to play the tape, he realized, "in 2 or 3 seconds" that he had brought in the wrong tape. Realizing his mistake, defendant took the tape out of the machine, placed it in his bag, and put the bag in his office. Defendant testified that he never authorized anyone to show the tape to the youth-residents.

Defendant testified that he did not know that any of the youth-residents had seen the videotape until learning it during the course of the trial. He admitted to showing the tape to his adult coworkers, but

testified that no one under 18 years old was present. Defendant also testified that he told the woman to say "This is for my boys at the JJP" because she had teased him earlier about accepting a job at the Center. At the time he made the videotape, defendant claimed he had not yet begun to work at the Center. Defendant also testified that he did not believe that the material on the videotape was any more harmful than the regular nightly programming on cable television.

The circuit court found that G.B.'s testimony was credible and that defendant's was not. In discussing the videotape, which the court stated it had viewed for "some period of time," the court noted that the tape contained "sex in all ways, all types of sex, oral, regular, hidden from the back, legs up, giving each other head, the whole nine yards." The court further stated:

> "[I] really saw nothing socially redeeming about [the tape] in the context of the way it would be viewed in this community. *** [W]e did not see anything that redeemed it, anything other than the prurient interest of the watcher and possibly the maker as well."

The circuit court then found defendant guilty of exhibiting harmful material to a minor and sentenced him to six months in the Cook County Department of Corrections.

In his posttrial motions for a new trial and for a reduction in the sentence, defendant did not object to the State's piecemeal presentation of the videotape to the trial court or argue that the tape did not qualify as "harmful" material under the statute. The circuit court denied both of defendant's motions. Defendant filed a timely notice of appeal.

## ANALYSIS

### A. CONSTITUTIONAL CHALLENGE

Defendant first levies a constitutional challenge to section 11—21 (hereinafter Harmful Materials statute), arguing that the statute (1) does not conform with the United States Supreme Court's decision in *Miller v. California*, 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973), which set forth guidelines that a state must meet when it seeks to regulate "obscene" material, and (2) is unconstitutionally vague.

We begin our analysis by recognizing the well-established rule that "[a]ll statutes are presumed to be constitutional, and the burden of rebutting that presumption is on the party challenging the validity of the statute to demonstrate clearly a constitutional violation." *People v. Greco*, 204 Ill. 2d 400, 406 (2003), citing *People v. Sypien*, 198 Ill. 2d 334, 338 (2001). This presumption means that, if possible, we must construe the statute "so as to affirm its constitutionality and validity." *Greco*, 204 Ill. 2d at 406, citing *People v. Fuller*, 187 Ill. 2d 1, 10 (1999).

The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. *People v. Ward*, 215 Ill. 2d 317, 324 (2005). The best indication of the legislature's intent is the language of the statute, which should be given its plain or ordinary and popularly understood meaning. See *People v. Ward*, 346 Ill. App. 3d 482, 484 (2004). Whether a statute is constitutional is a question of law that we review *de novo*. *People v. Malchow*, 193 Ill. 2d 413, 418 (2000).

■ The Harmful Materials statute states:

"A person who, with knowledge that a person is a child, that is a person under 18 years of age, or who fails to exercise reasonable care in ascertaining the true age of a child, knowingly distributes to or sends or causes to be sent to, or exhibits to, or offers to distribute or exhibit any harmful material to a child, is guilty of a misdemeanor." 720 ILCS 5/11—21(a) (West 2002).

The statute defines "harmful material" as follows:

"Material is harmful if, to the average person, applying contemporary standards, its predominant appeal, taken as a whole, is to prurient interest, that is a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters, and is material the redeeming social importance of which is substantially less than its prurient interest." 720 ILCS 5/11—21(b)(1) (West 2002).

In a section entitled "Interpretation of Evidence," the legislature provided further guidance as to how prosecutions under this statute should proceed:

"The predominant appeal to prurient interest of the material shall be judged with reference to average children of the same general age of the child to whom such material was offered, distributed, sent or exhibited, unless it appears from the nature of the matter or the circumstances of its dissemination, distribution or exhibition that it is designed for specially susceptible groups, in which case the predominant appeal of the material shall be judged with reference to its intended or probable recipient group.

In prosecutions under this section, where circumstances of production, presentation, sale, dissemination, distribution, or publicity indicate the material is being commercially exploited for the sake of its prurient appeal, such evidence is probative with respect to the nature of the material and can justify the conclusion that the redeeming social importance of the material is in fact substantially less than its prurient appeal." 720 ILCS 5/11—21(c) (West 2000).

### 1. *Miller*'s "Obscenity" Test

Defendant argues that the language of the Harmful Materials

statute does not conform with the guidelines, set forth under *Miller*, that a state must meet when it attempts to regulate obscene material. In *Miller*, the Supreme Court was "called on to define the standards which must be used to identify obscene material that a State may regulate without infringing on the First Amendment." *Miller*, 413 U.S. at 19-20, 37 L. Ed. 2d at 428, 93 S. Ct. at 2612. Even though it had been "categorically settled" that "obscene material is unprotected by the First Amendment (*Miller*, 413 U.S. at 23, 37 L. Ed. 2d at 430, 93 S. Ct. at 2614, citing *Kois v. Wisconsin*, 408 U.S. 229, 33 L. Ed. 2d 312, 92 S. Ct. 2245 (1972)), the *Miller* Court "acknowledge[d] *** the inherent dangers of undertaking to regulate any form of expression" and cautioned that "[s]tate statutes designed to regulate obscene materials must be carefully limited." *Miller*, 413 U.S. at 23-24, 37 L. Ed. 2d at 430, 93 S. Ct. at 2614.

■ After recounting both *Roth v. United States*, 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957), and *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts*, 383 U.S. 413, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966), decisions which it characterized as "landmark *** in the somewhat tortured history of the Court's obscenity decisions" (*Miller*, 413 U.S. at 20, 37 L. Ed. 2d at 428, 93 S. Ct. at 2612-13), the Court retooled the "obscenity" standard of both *Roth* and *Memoirs*, confining the "permissible scope of such regulation to works which depict or describe sexual conduct" (*Miller*, 413 U.S. at 24, 37 L. Ed. 2d at 430, 93 S. Ct. at 2614-15), and laying out three "basic guidelines" that a state law must meet to protect "the First Amendment values applicable to the States through the Fourteenth Amendment" (*Miller*, 413 U.S. at 25, 37 L. Ed. 2d at 431, 93 S. Ct. at 2615):

"(a) [W]hether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest [citations]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24, 37 L. Ed. 2d at 431, 93 S. Ct. at 2615.

Defendant argues that the Harmful Materials statute violates guidelines (b) and (c) listed above.

Citing guideline (b)'s mandate that the proscribed depictions of sexual conduct must be "specifically defined by the applicable state law," defendant argues that the Harmful Materials statute fails guideline (b) because the statute "has never been interpreted by the courts, let alone construed so as to provide the definitional boundaries

required under *Miller*." Defendant also argues that the "statute, as written, fails to define or describe what constitutes a proscribed depiction of sexual conduct."

Defendant further argues that guideline (b)'s "specific definition" requirement is also violated by the section of the Harmful Materials statute that requires the trier of fact to determine whether the "predominant appeal" of the material at issue is to the "prurient interest" of both an average person and average children of the same general age as the child to whom the material was distributed. See 720 ILCS 5/11—21(b)(1), (c) (West 2002).

Additionally, defendant argues that guideline (c) is violated because instead of limiting the inquiry into whether the material at issue, "taken as a whole, lacks serious literary, artistic, political, or scientific value" (*Miller*, 413 U.S. at 24, 37 L. Ed. 2d at 431, 93 S. Ct. at 2615), the Harmful Materials statute criminalizes the distribution of material "the redeeming social importance of which is substantially less than its prurient appeal" (720 ILCS 5/11—21(b)(1) (West 2000)). The unconstitutional impact of this deviation, defendant argues, is that "[a] work that is socially important, and that would be protected under *Miller*, could nevertheless be found to be 'harmful' under the Illinois statute."

The State argues that the guidelines set forth in *Miller* do not apply here because the Harmful Materials statute does not simply target and criminalize the distribution of "obscene" material to children; it seeks to criminalize the distribution of any material deemed "harmful" to them, even if that material would be constitutionally protected under the first amendment if distributed to adults. Relying on *Ginsberg v. New York*, 390 U.S. 629, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968), the State maintains that it has the power to regulate and criminalize the distribution of harmful, yet protected, material to minors. We agree.

In *Ginsberg*, two proprietors of a Long Island lunch counter were prosecuted under section 484—h of the New York Penal Law[1] after they sold "some so-called 'girlie' magazines" to a 16-year-old boy.

---

[1]Section 484—h of the New York Penal Law made it a crime to " 'knowingly *** sell ... to a minor' under 17 of '(a) any picture ... which depicts nudity ... and which is harmful to minors,' and '(b) any ... magazine ... which contains ... [such pictures] ... and which, taken as a whole, is harmful to minors.' " *Ginsberg*, 390 U.S. at 633, 20 L. Ed. 2d at 200, 88 S. Ct. at 1277, quoting N.Y. Penal Law § 484—h (1909) (see N.Y. Penal Law § 235.20 (1965)). Material was considered " 'harmful to minors' " if it " '(i) predominantly appeals to the prurient, shameful or morbid interest of minors, and (ii) is patently offensive to prevailing standards in the adult community as a whole

*Ginsberg,* 390 U.S. at 631, 20 L. Ed. 2d at 199, 88 S. Ct. at 1276. On appeal, the United States Supreme Court took up "the question of the constitutionality on its face of a New York criminal obscenity statute which prohibit[ed] the sale to minors under 17 years of age of material defined to be obscene on the basis of its appeal to them whether or not it would be obscene to adults." *Ginsberg,* 390 U.S. at 631, 20 L. Ed. 2d at 199, 88 S. Ct. at 1275-76.

After noting that "[t]he 'girlie' picture magazines involved in the sales here [were] not obscene for adults" (*Ginsberg,* 390 U.S. at 634, 20 L. Ed. 2d at 201, 88 S. Ct. at 1277, citing *Redrup v. State of New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967)), the Court framed the defendant's argument as follows:

> "Appellant's primary attack upon [section] 484—h is leveled at the power of the State to adapt [the] *Memoirs* [obscenity] formulation to define the material's obscenity on the basis of its appeal to minors, and thus exclude material so defined from the area of protected expression. He makes no argument that the magazines are not 'harmful to minors' within the definition in subsection 1(f). Thus '[n]o issue is presented ... concerning the obscenity of the material involved.' *Roth, supra,* at 481 n.8." *Ginsberg,* 390 U.S. at 635, 20 L. Ed. 2d at 201, 88 S. Ct. at 1278.

Citing the New York Court of Appeals, the Court rejected the defendant's argument that a State may not " 'employ variable concepts of obscenity' " depending upon the reader's age:

> " '[M]aterial which is protected for distribution to adults is not necessarily constitutionally protected from restriction upon its dissemination to children. In other words, the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined. Because of the State's exigent interest in preventing distribution to children of objectionable material, it can exercise its power to protect the health, safety, welfare and morals of its community by barring the distribution to children of books recognized to be suitable for adults.' " *Ginsberg,* 390 U.S. at 636, 20 L. Ed. 2d at 202, 88 S. Ct. at 1278-79, quoting *Bookcase, Inc. v. Broderick,* 18 N.Y.2d 71, 75, 271 N.Y.S.2d 947, 952, 218 N.E.2d 668, 671 (1966).

Though section 484—h criminalized the distribution of nonobscene, and, therefore, constitutionally protected, material, the Court upheld the statutory scheme and affirmed the defendant's conviction:

---

with respect to what is suitable material for minors, and (iii) is utterly without redeeming social importance for minors.' " *Ginsberg,* 390 U.S. at 632-33, 20 L. Ed. 2d at 200, 88 S. Ct. at 1276, quoting N.Y. Penal Law 1909 § 484—h(1)(f) (1909) (see N.Y. Penal Law § 235.20 (1965)).

"We do not regard New York's regulation in defining obscenity on the basis of its appeal to minors under 17 as involving an invasion of such minors' constitutionally protected freedoms. Rather [section] 484—h simply adjusts the definition of obscenity 'to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests ...' of minors. [Citations.] That the State has power to make that adjustment seems clear, for we have recognized that even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults. ...' [Citation.]" *Ginsberg*, 390 U.S. at 638, 20 L. Ed. 2d at 203, 88 S. Ct. at 1279-80.

We have previously interpreted *Ginsberg* as allowing a state to regulate and criminalize the distribution to children of material that it could not if distributed to adults. See *People v. Lerch*, 134 Ill. App. 3d 643, 656 (1985) ("In [*Ginsberg*], the court affirmed the defendant's conviction for selling sexually oriented but nonobscene material to minors"), *superceded by statute on other grounds as recognized by People v. Hebel*, 174 Ill. App. 3d 1, 17-21 (1988), quoting Ill. Rev. Stat. 1983, ch. 38, pars. 11—20.1(a)(1)(vii), (a)(5), *abrogated on other grounds by People v. Lawson*, 163 Ill. 2d 187, 222-25 (1994); *People v. Spargo*, 103 Ill. App. 3d 280, 285 (1982) ("That the State has a legitimate interest in protecting its children is a matter not open to dispute"); *People ex rel. Carey v. Starview Drive-In Theatre, Inc.*, 100 Ill. App. 3d 624, 637 (1981) (noting that "a State or municipality can adopt more stringent controls on communicative materials available to youth than on those available to adults"); *Motion Picture Appeal Board of the City of Chicago v. S.K. Films*, 65 Ill. App. 3d 217, 225 (1978) ("In *Ginsberg*, the Supreme Court upheld a conviction for selling to a minor a magazine which was admittedly not obscene if shown to adults").

More importantly, *Miller*, upon which defendant's first tilt at the Harmful Materials statute relies, recognizes this principle:

" 'We have indicated ... that because of its strong and abiding interest in youth, a State may regulate the dissemination to juveniles of, and their access to, material objectionable as to them, but which a State clearly could not regulate as to adults. *Ginsberg v. New York*, ... [390 U.S. 629 (1968)].' *Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676, 690 (1968) (footnote omitted)." *Miller*, 413 U.S. at 36 n.17, 37 L. Ed. 2d at 438 n.17, 93 S. Ct. at 2621 n.17.

See also *Federal Communications Comm'n v. Pacifica Foundation*, 438 U.S. 726, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978) (upholding Federal Communications Commission regulation of indecent but nonobscene speech aired on the radio during a time period when the audience

would likely include children, in order to protect them from what was otherwise protected expression).

Of course, there are limits to this principle. A state, seeking to keep nonobscene, yet "harmful" material from its minors, can impermissibly create a statute that is overbroad in scope:

> " 'Clearly all nudity cannot be deemed obscene even as to minors. See *Ginsberg v. New York, supra*. Nor can such a broad restriction be justified by any other governmental interest pertaining to minors. Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.' " *Carey*, 100 Ill. App. 3d at 637, quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14, 45 L. Ed. 2d 125, 133, 95 S. Ct. 2268, 2274-75 (1975).

However, defendant has not asked us to consider those limits or whether the Harmful Materials statute itself is overbroad. See, *e.g.*, *New York v. Ferber*, 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348 (1982) (employing the "substantial overbreadth" test and upholding a child pornography statute). Nor has he questioned whether the Harmful Materials statute conforms with *Ginsberg* (in fact, defendant did not cite *Ginsberg* at all in his opening brief and only mentioned it in his reply brief in response to the State's brief).

■ Instead, in arguing that the Harmful Materials statute is unconstitutional, he relies solely upon *Miller*'s guidelines. Our legislature, in fashioning the reach of the Harmful Materials statute, was not confined to criminalizing the distribution of only "obscene" material to minors; it could regulate any material it deemed "harmful" to them even if that material was constitutionally protected if distributed to adults.[2] Because the legislature was not so limited, defendant's reliance upon *Miller*'s three-part "obscenity" guidelines is misplaced. We express no opinion, however, as to whether the Harmful Materials statute is overbroad or in conformance with the principle announced in *Ginsberg* and its progeny.

---

[2]This is apparently what the legislature did, for, in 1961, it also enacted an "obscenity" statute (now see 720 ILCS 5/11—20 (West 2002)), which, after amendment in 1973, explicitly adopted the *Miller* guidelines. See *Ward v. Illinois*, 431 U.S. 767, 52 L. Ed. 2d 738, 97 S. Ct. 2085 (1977) (upholding constitutionality of Illinois's obscenity statute in light of *Miller*). Both the obscenity statute and the Harmful Materials statute carry the same penalty: Class A misdemeanor for the first offense and Class 4 felony for subsequent offenses. Compare 720 ILCS 5/11—20(d) (West 2002), with 720 ILCS 5/11—21(d) (West 2002). Thus, the legislature's enactment of both statutes only makes sense if the Harmful Materials statute is read as reaching both "obscene" and nonobscene, yet "harmful," material.

## 2. Vagueness Challenge

Defendant next argues that the Harmful Materials statute is unconstitutionally vague because it fails to both "provide ordinary people adequate notice of what conduct is proscribed" and "define the offense in a manner that prevents arbitrary and standardless enforcement." Specifically, defendant contends that the statute's "broad and antiquated" terms, *i.e.*, "prurient interest," "shameful or morbid interest in nudity, sex, or excretion," "substantially beyond customary limits of candor," and "redeeming social importance," provide "virtually no guidance as to the statute's reach." Defendant also argues that because these terms "fail to explain the statute's scope," the statute is amenable to a "standardless application of its requirements" which "may vary from courtroom to courtroom, and judge to judge."

■ Due process requires that a statute must (1) not be so vague that men of common intelligence must necessarily guess at its meaning or application and (2) provide sufficiently definite standards for law-enforcement officers and triers of fact that its application does not depend merely on their private conceptions. See *People v. Smith*, 347 Ill. App. 3d 446, 450 (2004), citing *People v. Garrison*, 82 Ill. 2d 444, 453 (1980). If the statute implicates first amendment expressive rights, it must not be so vague as to chill free exercise. See *Smith*, 347 Ill. App. 3d at 450, citing *Garrison*, 82 Ill. 2d at 453.

Though defendant's first amendment rights are potentially implicated by the Harmful Materials statute (for the statute's reach stretches beyond solely "obscene" material and criminalizes the distribution of material that, though protected under the first amendment, is deemed harmful to minors), we reject defendant's vagueness challenge.

■ Both the United States Supreme Court and our supreme court have found that the language defendant claims here to be "broad and antiquated" is not unconstitutionally vague. See *Ward*, 431 U.S. at 771-73, 52 L. Ed. 2d at 744-45, 97 S. Ct. at 2088-89; *People v. Ridens*, 59 Ill. 2d 362, 371-72 (1974). In both *Ward* and *Ridens*, the defendants argued, *inter alia*, that Illinois's obscenity statute was unconstitutionally vague. See *Ward*, 431 U.S. at 771-73, 52 L. Ed. 2d at 744-45, 97 S. Ct. at 2088-89; *Ridens*, 59 Ill. 2d at 371-72. As defendant noted in his reply brief, at the time those cases were decided, the language of Illinois's obscenity statute "mimic[ked]" that of the Harmful Materials statute:

> " 'A thing is obscene if, considered as a whole, its predominate appeal is to *prurient interest*, that is *a shameful or morbid interest in nudity, sex or excretion*, and if it goes *substantially beyond customary limits of candor* in description or representation of such matters.' " (Emphasis added.)

See *Ward,* 431 U.S. at 770, 52 L. Ed. 2d at 743-44, 97 S. Ct. at 2087-88, quoting Ill. Rev. Stat. 1975, ch. 38, par. 11—20(b); *Ridens,* 59 Ill. 2d at 367-68, quoting Ill. Rev. Stat. 1969, ch. 38, par. 11—20.

In both cases, the defendants' vagueness challenges were rejected. See *Ward,* 431 U.S. at 772-73, 52 L. Ed. 2d at 745, 97 S. Ct. at 2089 (characterizing as "wholly without merit" the defendant's claim that Illinois's obscenity statute was vague and gave him no notice that the statute banned the kind of materials he sold); *Ridens,* 59 Ill. 2d at 371-72 (finding that the statutory definition of obscenity in section 11—20, which contained the phrases " 'appeal to the prurient interest,' " " 'shameful or morbid interest in nudity, sex or excretion,' " and " 'redeeming social value,' " was not unconstitutionally vague).

Of course, the phrases defendant complains of here are not part of the everyday vernacular. It is unlikely, for instance, that the phrase "prurient interest" is ever used during casual conversation to describe purveyors of child pornography. Nor is one likely to hear a purchaser of obscene pornography publicly scolded for exhibiting a "shameful or morbid interest in nudity, sex or excretion," or a disapproving parent complain to a newspaper-stand vendor that his "girlie" magazines lack any "redeeming social value." Yet, that does not mean the statute is vague.

"A statute or ordinance designed to regulate many types of activities must frequently be couched in general terms." *Ridens,* 59 Ill. 2d at 371 (discussing Illinois's obscenity statute). "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 33 L. Ed. 2d 222, 228-29, 92 S. Ct. 2294, 2300 (1972). Though the Harmful Materials statute does not "attempt to particularize all of the myriad kinds of conduct that may fall within the statute," we believe that the "legislature deliberately chose to frame the provision in general terms, prompted by the futility of an effort to anticipate and enumerate all of the methods of disrupting public order that fertile minds might devise." *People v. Raby,* 40 Ill. 2d 392, 396 (1968) (rejecting contentions that section 26—1(a) and 31—1 of the Criminal Code were vague and overbroad).

Moreover, we find that defendant's vagueness challenge to the Harmful Materials statute is forestalled by both *Ward* and *Ridens,* which, in upholding Illinois's obscenity statute, found that the very language that defendant claims here to be unconstitutionally vague was, in fact, not so. See *People v. Hall,* 143 Ill. App. 3d 766, 780 (1986) (" '[S]ince the Illinois Supreme Court has declared the Illinois obscenity statute to be constitutional, the defendant is in the wrong forum for the relief he seeks. When the supreme court of this State has

declared the law [on] any point, only it can overrule and modify its opinion, and an appellate court is bound by its decision' ''), quoting *People v. Pope*, 138 Ill. App. 3d 726, 736 (1985); see also *People v. Rosinski*, 351 Ill. App. 3d 459, 463 (2004) ('' 'After our supreme court has declared the law with respect to an issue, this court must follow that law, as only the supreme court has authority to overrule or modify its own decisions' ''), quoting *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 836 (2004). Therefore, we find that defendant has not met his burden in clearly demonstrating that the Harmful Materials statute is unconstitutional. See *Greco*, 204 Ill. 2d at 406.

## B. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the State failed to prove his guilt beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence, it is not the function of this court to retry him on appeal. See *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Instead, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Ward*, 215 Ill. 2d at 322.

In a bench trial, the trial court, as the trier of fact, observes the witnesses and, thus, is responsible for judging their credibility, resolving any inconsistencies, determining the weight to give their testimony, and drawing reasonable inferences from all the evidence presented. See *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). "We will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

■ Defendant first argues that "[t]he State failed to prove [him] guilty beyond a reasonable doubt because the only evidence that [he] was even present during the minor's viewing of the material was the uncorroborated and unreliable testimony of" G.B. Specifically, defendant characterizes G.B.'s testimony as vague and inconsistent because he could not recall the exact date of his second, more extended, viewing of defendant's tape and he wavered as to who actually pressed the play button during this second viewing. He also argues that the State failed to prove that he "exhibited" or "distributed" the tape to any minor as required under the Harmful Materials statute, and that his mere presence in the dayroom when the tape was shown was insufficient.

Initially, we note that the circuit court, as the trier of fact, specifically found that, despite any inconsistency or discrepancy, G.B.'s

testimony was credible and that defendant's testimony was not. Due to the court's superior position to make this credibility determination, we decline to second-guess it.

Moreover, it is irrelevant under the Harmful Materials statute whether defendant, as the purveyor of the harmful material, was actually present in the dayroom or whether he actually pressed the play button. All that the statute requires is that he "knowingly distribute[d] to or sen[t] or cause[d] to be sent to, or exhibit[ed] to, or offer[ed] to distribute or exhibit" the tape to G.B. (720 ILCS 5/11—21(a) (West 2002)), and there was sufficient evidence that defendant did just that (tellingly, defendant does not contend that the tape was not "harmful" under the statute).

Not only did defendant knowingly make the tape and bring it into the Center (though he claimed by mistake), he also urged the woman shown on the tape to say: "This is for my boys at the JJP." Based upon this evidence, the circuit court could have rationally found that defendant knowingly exhibited the tape to minors. See *Ward*, 215 Ill. 2d at 331-32 (finding that the defendant, who left a sealed envelope containing naked pictures of herself on a weight bench in the garage of the minor's father, had knowingly distributed harmful material to that minor even though she never told the minor to open the envelope and was not present when the minor did so).

Finally, defendant argues that the State failed to prove that the tape, taken as a whole, appealed to prurient interest because the circuit court only viewed selected portions of the tape. Defendant argues that, without a complete viewing of the tape, the circuit court could not rationally find an essential element of the Harmful Materials statute, *i.e.*, that the predominant appeal of the videotape, "taken as a whole," appeals to prurient interest.

Not only did defendant fail to object to the manner in which the tape was shown to the circuit court or include this issue in his post-trial motion, but after the prosecutor stated that the tape would not be shown in its entirety (the ideal moment for defendant to raise an objection to the State's presentation of the tape), he entered into the following stipulation regarding the material on the tape:

> "This particular incident goes on for a while. And then after this scene, there is a scene in a garage in reference to what [G.B.] had said as well, where a girl is put into handcuffs, [and] another girl is displayed. And there is intercourse with that woman as well."

Generally speaking, a defendant is precluded from attacking or otherwise contradicting any facts to which he or she stipulated. See *People v. Jennings*, 364 Ill. App. 3d 473, 479 (2005), citing *People v. Gibson*, 287 Ill. App. 3d 878, 880 (1997). As our supreme court recently stated:

" 'A stipulation is conclusive as to all matters necessarily included in it' (34 Ill. L. & Prac. *Stipulations* § 8 (2001)) and '[n]o proof of stipulated facts is necessary, since the stipulation is substituted for proof and dispenses with the need for evidence' (34 Ill. L. & Prac. *Stipulations* § 9 (2001))." *People v. Woods*, 214 Ill. 2d 455, 469 (2005).

By stipulating that "this particular incident goes on for a while" (or, in other words, the tape is "more of the same"), defendant agreed that there was no need for the circuit court to view the entire tape. See *Woods*, 214 Ill. 2d at 468-69 (stating that "[t]he primary rule in the construction of stipulations is that the court must ascertain and give effect to the intent of the parties" to the stipulation). Thus, not only did defendant fail to object, he acquiesced to the presentation of the tape, and he cannot now be heard to complain.

Affirmed.

GREIMAN, J., concurs.

PRESIDING JUSTICE REID, dissenting:

I dissent. While I agree with the majority in many respects, I find impermissible vagueness in part of the Harmful Materials statute. As the majority explains, section (c) of the Harmful Materials statute is designed by the legislature to "provide[ ] further guidance as to how prosecutions under this statute should proceed." 358 Ill. App. 3d at 933. In pertinent part, that section reads:

"The predominant appeal to prurient interest of the material *shall be judged with reference to average children of the same general age of the child* to whom such material was offered, distributed, sent or exhibited, unless it appears from the nature of the matter or the circumstances of its dissemination, distribution or exhibition that it is designed for specially susceptible groups, in which case the predominant appeal of the material shall be judged with reference to its intended or probable recipient group." (Emphasis added). 720 ILCS 5/11—21(c) (West 2000).

I find that section is vague. There is no indication as to precisely how a trier of fact, whether that be a judge or jury, could reference the age of similar children. How is a trier of fact to determine what the average child would find prurient? How is a defendant to defend against an allegation that, as in this case, the average 16-year-old would have found the videotape prurient? No mechanism has yet been invented to allow a trier of fact to view the evidence filtered through the eyes of a child similarly situated with the victim.

"The due process vagueness standard is comprised of three ele-

ments. First, the statute must not be so vague that men of common intelligence must necessarily guess at its meaning or application. [Citation.] Second, the statute must provide sufficiently definite standards for law-enforcement officers and triers of fact that its application does not depend merely on their private conceptions. [Citation.] Finally, if the statute implicates first amendment expressive rights, it must not be so vague as to chill their free exercise." *People v. Smith*, 347 Ill. App. 3d 446, 450 (2004), citing *People v. Garrison*, 82 Ill. 2d 444, 453 (1980).

Under both *Smith* and *Garrison*, there is no way for adult jurors or law-enforcement officers to apply the law, as drafted, without the taint of their private conceptions of right and wrong, moral and immoral, sexy and prurient. This is, at least in part, due to the fact that, unlike adult obscenity, the Harmful Materials statute does not limit itself to those materials that "taken as a whole, *** lack serious literary, artistic, political or scientific value." 720 ILCS 5/11—20(b) (West 2000). An adult can determine whether something is obscene based on those criteria, because no childlike prism is required. This is where the Illinois Harmful Materials statute is unconstitutionally vague. "A statute violates due process 'on the basis of vagueness " 'only if its terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts.' " ' " *People v. Einoder*, 209 Ill. 2d 443, 451 (2004), quoting *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 291 (2003), quoting *Stern v. Norwest Mortgage, Inc.*, 179 Ill. 2d 160, 168 (1997), quoting *People v. Burpo*, 164 Ill. 2d 261, 265-66 (1995). That is the precise problem with our Harmful Materials statute; there is no way for an adult to truly put himself or herself in the mind of a child. Therefore, the mechanism of enforcement is vague because it rests on little more than whims. The reality is that each trier of fact may perceive the prurient interests and sexual desires of minors differently. In the case of Jackson showing his homemade pornography to G.B., the ultimate call under the statute may be easier to make than in other cases that could present themselves in the future. Nevertheless, the inherent problem in the mechanism created by the legislature persists. I, therefore, find section 11—21(c) unconstitutionally vague and would reverse on that basis.