2024 IL App (1st) 210705-U

SIXTH DIVISION
March 8, 2024

No. 1-21-0705

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 20 CR 3580 |
| | ) | |
| Alijandro Mosqueda, | ) | The Honorable |
| | ) | Ramon Ocasio III |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The judgment of the trial court is affirmed in part and vacated in part. We find the evidence sufficient to convict the defendant of aggravated battery but vacate several of defendant's convictions as violative of the one act, one crime rule.

¶ 2                                   I. BACKGROUND

¶ 3    Defendant Alijandro Mosqueda (Mosqueda) was charged by indictment with seven counts of aggravated battery (720 ILCS 5/12-3.05 (West 2020)). Counts 1 through 3 pertained to victim Jose Pena (Pena) and Counts 4 through 7 pertained to victim Ana Irizarry (Irizarry). Following a

bench trial, the trial court found Mosqueda guilty of all seven counts of aggravated battery and sentenced him to four years' imprisonment on each of the seven counts, to run concurrently.

¶ 4     Mosqueda was tried on March 16, 2021, and the State presented the following evidence. Pena testified that on February 1, 2020, around 11 p.m., he arrived at Perception Lounge (Perception) in Berwyn, Illinois with his girlfriend Marisela Ramirez (Ramirez). Around 2 a.m., he noticed that Ramirez and an older woman, Maria Mosqueda (Maria), were inches apart arguing with each other near the dance floor. As he walked towards Ramirez and Maria, Maria's son, Mosqueda, stopped him. Mosqueda told Pena, "[g]et your girl. That's my mother." He replied, "[o]kay, I didn't know." Mosqueda replied, "[d]on't talk to me like that." He then walked over to Ramirez, patted her on her back, and said, "[h]ey, let's just go."

¶ 5     Pena testified that he and Ramirez turned around so their backs were facing Maria. Mosqueda was sitting at a table to the right. As he walked away, he "just felt the glass," "started to gush blood," and was "literally taking pieces of glass off [his] head." The glass hit him on the forehead, two inches from his eyebrow. Sometime after, both an ambulance and the police arrived at Perception. He was taken by ambulance to MacNeal Hospital where he received five stiches on his forehead. The incident left him with a permanent scar on his forehead.

¶ 6     Pena testified that he walked away from the confrontation and never touched Maria, nor did he see Ramirez have physical contact with Maria. The State introduced a photograph of Pena's forehead showing a gash on his forehead. On cross-examination, Pena testified that when he was 10 to 20 feet away from Ramirez and Maria, he believed they were arguing but he could not hear them. He went over to Ramirez because he did not want the argument to escalate. He testified that while Mosqueda was speaking to him in an aggressive matter, he never yelled back. He was about an arm's length or about two feet away from Mosqueda as they were leaving. Perception was semi-

crowded at the time of the incident. He talked to the bouncer "Big Homie" about the incident, and he saw the bouncers carry Mosqueda away. Pena acknowledged that he had previously been convicted of driving under the influence.

¶ 7    Ramirez testified that she had no more than two drinks on the night of the incident. She knew Maria and saw that Maria arrived at Perception with her "little crew." She kept her distance because she and Maria had an "incident before." Ramirez had previously met Maria's son, Mosqueda, and identified him in open court.

¶ 8    The bartender at Perception told Ramirez that Maria was talking about Ramirez bringing a new guy (Pena) to Perception. Ramirez testified, "I walked over to Maria because I wanted to talk to Maria and tell her not to start any commotion in the bar between my boyfriend and my ex's brother." Ramirez and Maria were just a couple inches apart facing each other. Mosqueda was about eight feet from them. Ramirez testified she told Maria, "[d]on't start no shit." Maria replied, "I don't want to start nothing. I don't want to catch a case." Ramirez testified that their voices were raised because they were in a club, and it was loud to begin with. She testified that because she did not intend for there to be an altercation, she did not ask Pena for backup. As she and Maria were talking, Pena walked over and tapped her on the shoulder and said, "[l]et's just go." She turned around so her back was to Maria and Pena. She did not see Pena speak to Maria.

¶ 9    As she walked away, the bar was to her left and Mosqueda to her right, and Pena was directly behind her. She heard Mosqueda say something and when she turned around, she saw that "the glass had already hit Pena." She was unsure if Mosqueda threw something. "Big Homie", the security guard at the club, grabbed Mosqueda, and Ramirez attended to Pena who was "gushing with blood." She tried to stop the bleeding with a rag.

¶ 10    On cross-examination, Ramirez testified that she stopped hanging out with Maria a year or two ago and knew of Mosqueda but never "socialized with him." She was upset that Maria was talking

3

about her. She had previous problems with Maria, and they were not on speaking terms. Although Maria was a troublemaker, Ramirez was the one who approached Maria that night. She did not see the glass leave Mosqueda's hand but saw "him with his hand raised." Ramirez knew Anthony Swiatek (Swiatek) as a bouncer at Perception.

¶ 11    Swiatek testified that he was working security at Perception on February 1, 2020, until the morning of February 2, 2020. He did not have any alcohol or drugs while he was working. If someone had too much to drink or was "causing problems" they were "escorted out" of Perception. Ramirez and Maria were regulars at Perception. He knew Mosqueda because he regularly came to the bar with his mother, Maria.

¶ 12    Swiatek testified that at 2 a.m. on February 2, 2020, he observed Maria dancing next to the DJ booth with a "blonde female and an African male." Maria was to his left and about eight to nine feet away. Mosqueda was adjacent to Maria sitting at a table with an unidentified female. Swiatek was in front of the table where Mosqueda was sitting. Mosqueda was to his left within arm's reach. Ramirez came from behind him to his right as she walked over to Maria. Ramirez and Maria began their "elevated conversation and it got heated." They started "shoving on each other" but he did not know who started it. He and Big Homie separated them. Pena then pulled Ramirez back.

¶ 13    Swiatek testified that as Pena was pulling back Ramirez, "a glass came flying from my left, thrown in the direction of Ramirez and caught Pena right in the face." The only people to his left were Mosqueda and the unknown female. As the glass went by him, Swiatek saw Mosqueda "finishing a throwing motion." Swiatek demonstrated the motion he observed Mosqueda make by moving his arm forward from a vertical position to where it was parallel to the ground. The unknown female next to Mosqueda was not moving. He was close enough to Mosqueda that he could have "reached over and touched" him. Swiatek had a clear and unobstructed view of

4

Mosqueda's face. He told police he could identify the person making the "throwing motion" and agreed to a "show up identification[.]" Police officers then transported him to where other officers had pulled over a vehicle with Mosqueda inside. Police officers put a spotlight on Mosqueda and asked Swiatek, "[i]s this the gentleman?" He told police officers it was.

¶ 14     On cross-examination Swiatek acknowledged that were 200 people in Perception on February 1, 2020, but explained that was not many patrons given the size of the club. Perception was dark and strobe lights were "going the whole time." Maria and Ramirez were a foot apart during their encounter, but he intervened when they "got nose-to-nose." Big Homie grabbed Maria and pulled her back while another bouncer went to grab Ramirez. Swiatek positioned himself so that Mosqueda was behind him but at a diagonal so he could concentrate on him as well as the physical encounter between Maria and Ramirez. Swiatek kept an eye on Mosqueda because Mosqueda had been at the club before and had to be escorted out. Swiatek first saw the glass when it flew past him, and then he saw it strike Pena who was walking behind Ramirez. He was perpendicular to Mosqueda the whole time and observed Mosqueda finishing a throwing motion. Using a baseball reference, Swiatek described how Mosqueda "finished the bottom half of the throw." On recross, Swiatek admitted that while there was a video recording system inside Perception, he did not have access to any video from February 2, 2020.

¶ 15     Irizarry testified that she sustained a permanent disability when a shard of glass punctured her left eye in the morning of February 2, 2020. She worked as a cashier before the injury, but had to stop because she could not see the register and had constant migraine headaches.

¶ 16     Irizarry was facing the bar area of Perception when security rushed past her and "spun [her] around." She then felt something fall into [her] eye." An ambulance took Irizarry to MacNeal Hospital but when they could not treat her, she was transported to Loyola Medical Center. A

surgeon removed a piece of glass from her eye. She had to go to follow-up treatment every week for five months, put drops in her eye every day, and wear an eye patch until she had a subsequent surgery. Irizarry testified on cross-examination that she did not see who threw the glass.

¶ 17   The prosecution rested. Defense counsel moved for a directed verdict, which the trial court denied. Mosqueda did not testify, and the defense rested.

¶ 18   The trial court found defendant guilty of all charges, making the following factual findings: "Anthony Swiatek, who testified here today, testified that he saw the end result of what appeared to be a throw. Given the timeframe of the circumstances, I believe that the State has shown beyond a reasonable doubt that [Mosqueda] threw this bottle directed at Mr. Jose Pena and that caused damage to his head and Ms. Ana Irizarry's eye, which included the permanent disability and disfigurement. I believe the State did meet its burden beyond a reasonable doubt."

¶ 19   Mosqueda filed a motion for new trial on March 29, 2021, arguing that he was charged because a fight was going on "involving [his] family and that lead [sic] the trier of fact to interpret" that he threw the glass. The state responded in part that based on the credible testimony of Swiatek, it was clear that Mosqueda "was the only person who could have thrown that glass." The trial court denied the motion.

¶ 20   The trial court sentenced Mosqueda to four years' imprisonment on each of the seven aggravated battery counts, to run concurrently. Mosqueda filed a motion to reconsider arguing that he was eligible for probation and that there was an anger management program he could attend. The trial court denied the motion. This timely appeal followed.

¶ 21                                II. ANALYSIS

¶ 22     On appeal, Mosqueda argues that his convictions should be overturned because the State's evidence was insufficient to prove beyond a reasonable doubt that he rather than someone else from Maria's "little crew" threw the glass. Specifically, he contends that because no one actually saw who threw the glass, the State's case was circumstantial, and the inferences drawn by the trial court were not reasonable.

¶ 23     In response, the State contends that the circumstantial evidence presented at trial was sufficient to prove Mosqueda was guilty beyond a reasonable doubt and the State is not required to disprove every hypothesis consistent with innocence to obtain a conviction. Furthermore, because the trial court is best equipped to judge the credibility of the witnesses, we must defer to the reasonable inferences that the trial court drew based on Swiatek's observations.

¶ 24     We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of defendant's guilt. *People v. Jackson*, 2020 IL 124112, ¶ 64. Thus, the critical question before us is whether trial evidence supports a finding of guilt beyond a reasonable doubt regardless of whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The trial court is best equipped to judge the credibility of the witnesses and "due consideration must be given to the fact that it was the trial court that saw and heard the witnesses." *Id.* at 114-15.

¶ 25     To convict Mosqueda of aggravated battery, the State had to prove that he committed battery in that he caused bodily injury to an individual, other than by the discharge of a firearm, and he knowingly caused permanent disability or permanent disfigurement, or committed a battery with a deadly weapon, other than a firearm. See 720 ILCS 5/12-3.05(a)(1), (f)(1) (West 2020).

¶ 26     Mosqueda argues that while the State's evidence showed that Mosqueda could have thrown the glass, the evidence did not show that he was the only person present who could have and would have had reason to do so. Mosqueda relies on *In re Gregory G.*, where a security guard was breaking up a fight between two women, one of whom was the juvenile respondent's mother. *In re Gregory G.,* 396 Ill. App. 3d 923, 924 (2009). The scene was "chaotic and there were over 100 people surrounding the fight. *Id.* at 924. As he was breaking up the fight, the security guard was "smacked in the back of the head with [a] beer bottle, which broke." *Id.* The security guard did not see who hit him with the bottle. *Id.* "[T]wo to three minutes later" he turned around and saw the [juvenile] respondent standing ten feet away and holding a broken beer bottle and did not see anyone else with a bottle. *Id.* at 925. When police officers arrived, they described the scene as "utter chaos" and that bottles and rocks were being thrown. *Id.* The juvenile respondent was convicted, but the Appellate Court reversed, reasoning that there was limited circumstantial evidence:

> "The State directly proved that [security guard] was hit by a bottle and that [juvenile] respondent possessed a broken bottle. But others also possessed bottles during the melee. And, significantly, there was a two-minute lapse between when [security guard] was hit and when he turned around, which makes the inferences of [juvenile] respondent's guilt even more tenuous. Lastly, [juvenile] respondent was standing 10 feet away when [security guard] observed him, while the other 99 people were also standing in the same vicinity. The evidence here raises a suspicion that [juvenile] respondent was the culprit in the battery of [security guard], but it is not sufficiently conclusive and does not produce a reasonable and moral certainty that [juvenile] respondent, and not one of the other 99 people involved in the fight, committed the crime. Under these circumstances, the trial

8

court stretched the limited circumstantial evidence beyond a reasonable inference." *Id.*
929-30

Mosqueda argues that as in *In re Gregory G.,* the evidence here is not sufficiently conclusive because the victims were hit by glass objects and a club like Perception has many glass objects. Moreover, there were 200 people inside the club, there was another unidentified female next to Mosqueda, and there were two other people with Maria that night. We do not find Mosqueda's reliance on *In re Gregory G.* to be persuasive as the facts are readily distinguishable. Here, there was no mass altercation surrounding Mosqueda, there was no time lapse between the glass hitting Pena and Swiatek observing Mosqueda's arm in the tail end of a throwing motion, and by all accounts Mosqueda was arm-length or two feet away from Swiatek. The only other person directly in the vicinity of Mosqueda was an "unidentified female" but unlike Mosqueda she did not appear to be moving at the time Swiatek observed Mosqueda's arm in motion.

¶ 29    Mosqueda's argument that the evidence does not establish that he, rather than another member of Maria's "little crew", threw the glass, also misses the mark. The State is not required to disprove that someone other than Mosqueda could have thrown the glass simply because the evidence supporting the conviction is circumstantial. *See People v. Pintos*, 133 Ill. 2d 286, 291 (1989) (holding that "the reasonable hypothesis standard of review is no longer viable in Illinois. Instead, *** the reasonable doubt test *** should be applied in reviewing the sufficiency of evidence in all criminal cases, whether the evidence is direct or circumstantial.").

¶ 27    Mosqueda's broader sufficiency of the evidence argument also fails. Mosqueda's argument hangs on Swiatek's testimony about seeing Mosqueda "finishing a throwing motion." Relying on *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001), Mosqueda argues that Swiatek's testimony about Mosqueda finishing a throwing motion is "contrary to human experience." We are unpersuaded

by Mosqueda's attempts to call into question the description of the mechanics of an arm in throwing motion or to present alternatives as to why a more innocent interpretation—like someone pointing—could also look like "finishing a throwing motion." The trial court was in a superior position to assess the credibility of witnesses, resolve inconsistencies, weight the testimony, and draw inferences. *People v. Jackson*, 358 Ill. App. 3d 927, 941 (2005). The trial court credited Swiatek's testimony that he observed Mosqueda in a tail end of a throwing motion, from which it reasonably inferred that Mosqueda threw the glass that struck Pena. Moreover, it was the trial court that not only heard the testimony but *saw* Swiatek demonstrate with his arm the motion he observed Mosqueda make on February 2, 2020. We do not have the benefit of seeing Swiatek's demonstration of Mosqueda's arm motion, but the trial court did, describing it "as if throwing a ball and following through with the motion."

¶ 28    We find that evidence sufficiently supports the trial court's conclusion. The trial court credited Swiatek's testimony about his observation of Mosqueda, took into consideration the timeframe, and ultimately inferred that Mosqueda was the one that threw the glass. When Swiatek saw the glass fly by him and strike Pena, he instantaneously looked back to see Mosqueda at the end of throwing motion. Additionally, the only other person near Mosqueda was an unidentified female and Swiatek did not observe any movement from her. Lastly, the evidence also showed that Mosqueda and Pena exchanged words before Pena was hit in the head by a glass.

¶ 29    Next, Mosqueda asserts, and the State concedes, that five of the seven convictions of aggravated battery violate the one-act, one crime rule. We agree. The issue was not raised before the trial court or in any post-trial motions, but we may review it under the second prong of the plain error doctrine as a violation that affects the integrity of the judicial process. See *People v. Nunez*, 236 Ill. 2d 488, 493 (2010).

¶ 30    Under the one-act, one crime rule, a defendant may not be convicted of multiple offenses that are based upon precisely the same single physical act. *People v. Johnson,* 237 Ill. 2d 81, 97 (2010). When the rule is violated, the conviction on the less serious offense should be vacated. *People v. Coats*, 2018 IL 121926. ¶ 33. To determine which offense is less serious, we consider the possible punishment and culpable mental state of each offense. *Id.* The application of the one-act, one crime rule is a question of law, and we will review it *de novo. Johnson*, 237 Ill. 2d at 97.

¶ 31    Mosqueda was charged with three counts of Class 3 aggravated battery (720 ILCS 5/12-3.05 (West 2020)), for striking Pena in the head with a glass. Count 1 was for causing bodily harm with a deadly weapon, Count 2 was for causing great bodily harm, and Count 3 was for causing permanent disfigurement. Mosqueda was also charged with four counts of Class 3 aggravated battery (720 ILCS 5/12-3.05 (West 2020)) for causing glass to strike Irizarry in the eye. Count 4 was for causing bodily harm with a deadly weapon, Count 5 was for causing great bodily harm, Count 6 was for causing permanent disability, and Count 7 was for causing permanent disfigurement.

¶ 32    Of the seven counts, Count 3 is the most serious conviction related to Pena and Count 6 is the most serious conviction related to Irizarry because of the permanency and effect of the injury on each victim. Accordingly, Mosqueda's convictions for Counts 1, 2, 4, 5, and 7 are vacated.

¶ 33                                        III. CONCLUSION

¶ 34    For the foregoing reasons, Mosqueda's convictions on Counts 3 and 6 are affirmed. Mosqueda's convictions on counts 1, 2, 4, 5, and 7 are vacated.

¶ 35    Affirmed in part; vacated in part.