# Illinois Official Reports

## Appellate Court

---

### *People v. Trzeciak*, 2014 IL App (1st) 100259-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH TRZECIAK, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-10-0259 |
| Filed | October 29, 2014 |
| Rehearing denied | November 26, 2014 |
| Modified upon denial of rehearing | December 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the first-degree murder of a man he accused of having a relationship with his estranged wife was affirmed where the evidence, including his threat two months prior to the murder to kill his wife and the victim, another incident in which he abused his wife based on his suspicions, and his strange actions after the murder, was sufficient to allow a rational trier of fact to find defendant guilty beyond a reasonable doubt; furthermore, the evidence supported the finding that defendant shot a firearm in committing the offense, thereby making him subject to the 40-year firearm enhancement, and the sentence imposed was proportionate to the seriousness of the offense and consistent with defendant's rehabilitative potential, but the mittimus was corrected to reflect a single conviction for first-degree murder. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-28283; the Hon. Angela Munari Petrone, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on Appeal

Michael J. Pelletier and Jennifer L. Bontrager, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant, Joseph Trzeciak, was convicted of first-degree murder for killing Donald Kasavich. Trzeciak was sentenced to 90 years' imprisonment, 50 years for first-degree murder, with a 40-year enhancement for the use of a firearm during the commission of the murder. This court, with one justice dissenting, reversed Trzeciak's conviction, holding that a threat Trzeciak made to his estranged wife that he would kill her and Kasavich was inadmissible under Illinois's marital communication privilege and the statement's introduction at trial was prejudicial to Trzeciak. *People v. Trzeciak*, 2012 IL App (1st) 100259. Justice Murphy dissented, reasoning that Trzeciak did not intend for his conduct and threat to remain confidential and, therefore, the marital privilege did not extend to its use. The supreme court granted the State's petition for leave to appeal.

¶ 2 The sole issue before the supreme court was whether the marital privilege applied to the April 2004 conversation between Trzeciak and his wife. The supreme court held the threat did not constitute a confidential communication, reversed the judgment, and remanded the case for us to address the other issues raised by Trzeciak's appeal. *People v. Trzeciak*, 2013 IL 114491, ¶ 53.

¶ 3 On remand, we have carefully considered all of Trzeciak's challenges and find no reversible error. The evidence at trial proved Trzeciak guilty beyond a reasonable doubt. The trial court properly admitted evidence of his flight to show consciousness of guilt and proof of his spousal abuse on the issue of his motive. While we disapprove of the manner of the exchange between the trial court and the prospective juror who claimed bias during *voir dire*, we reject Trzeciak's contention that the trial court's conduct affected his right to a fair trial. Further, we find no error in the trial court's limit of the defense witness's testimony where the court's ruling did not frustrate defense counsel's ability to rebut the State's evidence. The trial court did not abuse its discretion in sentencing Trzeciak. His sentence is within the statutory range and is proportionate to the nature of the offense. Lastly, Trzeciak is correct that the mittimus must be amended to reflect a single conviction of murder. Accordingly, we

uphold the judgment of the trial court and correct the mittimus to reflect only one murder conviction.

¶ 4                                           BACKGROUND

¶ 5        On June 29, 2004, Donald Kasavich was found dead in his trailer in the Hegewisch area of Chicago. He suffered three gunshot wounds to the head. His trailer was found in disarray and a window had been broken. (We will provide greater detail of the facts as they become relevant to each of Trzeciak's claims of error.)

¶ 6        The defense moved to dismiss the charges as based on evidence from Daniel Barnas, who was dead at the time of trial and, thus, unavailable to testify. Defense counsel's motion, after noting that both the murder weapon and a prescription belonging to Kasavich were found at Barnas's house, argued that Barnas tried to pin the murder on Trzeciak. The trial court denied the motion to dismiss because the sufficiency of the evidence was an issue to be determined by the jury.

¶ 7        Trzeciak also filed several motions *in limine* to exclude various physical evidence and testimony. Defense counsel sought to prevent the State from introducing: (1) the testimony of his estranged wife, Laura Nilsen, about threats Trzeciak made toward both her and Kasavich based on marital privilege (subject of the 2012 opinion); (2) Nilsen's testimony about domestic violence as prior bad acts; (3) photographs Hammond police took of Nilsen showing extensive bruising as too prejudicial; (4) evidence from Trzeciak's truck on the grounds the consent to search lacked authority; (5) the circumstances of Trzeciak's arrest by Hammond police and other evidence of flight as prejudicial and irrelevant; and (6) the small bloody piece of glass and evidence related to it on the basis that the chain of custody was inadequate.

¶ 8        Following extensive hearings on the motion *in limine*, the court denied all of the defense motions. (We note the record on appeal only includes the motions and memoranda filed by the defense, not those filed by the prosecution.) The court ruled there was no chain of custody problem and denied that motion (point (6) above). The court also denied Trzeciak's motion about prior arrests and flight, finding evidence of flight was admissible as consciousness of guilt (point (5) above). No ruling was made on the motion to suppress evidence obtained from the search of Trzeciak's truck because the State informed the court it did not intend to use the evidence (point (4) above). The court denied Trzeciak's request to exclude photographs Hammond police took of Nilsen finding them more probative than prejudicial on the issue of motive (point (3) above).

¶ 9        Concerning Trzeciak's prior domestic violence (point (2) above), the trial court agreed to allow the State to introduce some testimony about domestic violence, specifically any evidence tending to show motive for the murder. But, after viewing Nilsen's videotaped statement to the police, the trial court held the jury would not be allowed to see it.

¶ 10       While the original opinion of this court did not address evidence of Trzeciak's prior domestic violence, the supreme court, after recognizing that Trzeciak's motion to exclude evidence of the prior domestic violence was not based on the marital privilege, nevertheless held that Trzeciak's conduct (which took place in April 2004) "need not have been barred by the marital privilege." *People v. Trzeciak*, 2013 IL 114491, ¶ 48.

¶ 11    Later, the State moved to bar the defense from presenting testimony from John Riggio, a gun shop manager, from using photographic evidence of other guns from his shop. Defense counsel explained that to impeach witnesses' identification of Trzeciak's gun as the murder weapon, he wished to show a "gun array" to them to demonstrate how similar the murder weapon, which would only be shown in photographs, was to other gun models. The court deferred ruling on this issue until the relevant witnesses testified and instructed defense counsel to ask for a sidebar at that time.

¶ 12    During jury selection, one potential juror stated that his wife's cousin had been accused of shooting at an off-duty officer and this could "possibly" make him unable to be fair. After further questioning, the potential juror stated he might not be fair to the prosecution. The judge responded:

> "You are not excused. You will sit here and come back every day of the trial and watch how a fair jury operates. You can sit back there and come back every day of the trial under my direct order. Sit in the back."

Following the parties' in-chambers challenges to the panel, the trial judge excused the rejected jurors, but not the potential juror who claimed a possible bias. That juror was told to "sit here and come back every day of the trial and watch how a fair jury operates."

¶ 13    At the conclusion of the trial, the jury found Trzeciak guilty on all counts. Defense counsel filed a posttrial motion, which the court denied after a hearing.

¶ 14    At sentencing, the State presented testimony, over defense objection, from Hammond police officer Todd Larson, who testified about the ammunition found in Trzeciak's trailer after his arrest, as well as its general condition. Kasavich's sister read a victim impact statement. The State introduced Trzeciak's prior convictions: aggravated battery to a peace officer, delivery of cocaine, and unlawful use of a weapon by a felon. In mitigation, the defense offered a transcript of federal court testimony from an investigator who looked into Trzeciak's alleged abuse by his fourth-grade teacher, as well as a sentencing recommendation from a federal conviction advising aggressive psychiatric treatment.

¶ 15    The sentencing court summarized the evidence and found Trzeciak to be an increasingly violent offender from whom the public needed protection. The court found no mitigation present and sentenced Trzeciak to 50 years for murder, with a 40-year firearm enhancement, to run consecutively to his federal sentence.

¶ 16                                            ANALYSIS
¶ 17                              Sufficiency of the Evidence
¶ 18    Trzeciak contends the evidence, all circumstantial, fails to sustain his conviction of first-degree murder for the shooting death of Donald Kasavich. Trzeciak attaches significance to the absence of physical evidence such as fingerprints, hairs, or fibers identifying anyone other than the victim despite a serious conflict having occurred at Kasavich's home, resulting in broken windows, torn blinds, and general disarray. And, the DNA recovered from under Kasavich's fingernails specifically excluded Trzeciak as the source. In addition, the shell casings at the scene matched a weapon recovered from Daniel Barnas's house. As for Trzeciak's DNA on a shard of glass found outside the trailer, the DNA cannot be linked to a specific time or date and does not place him inside the trailer or

- 4 -

otherwise implicate him in Kasavich's murder. No one witnessed the shooting and Trzeciak never confessed.

¶ 19     Trzeciak argues the State's attempt to link the gun recovered from Barnas's house to him fails because the witnesses who looked at the photograph of the murder weapon could not distinguish it from other similar makes and models. Trzeciak further argues the State's own evidence rebuts the State's theory that he was injured and left DNA after breaking the trailer's rear bedroom window and crawling out of it. No blood was found in the rear bedroom, which appeared undisturbed, including the dust on the windowsill. To Trzeciak, the single, small puncture wound on his wrist belies the kind of violence necessary to cause the extensive bruising to Kasavich, break multiple windows, tear blinds from the wall, and upend furniture. Therefore, contends Trzeciak, nothing links him to the crime scene or murder weapon, leaving reasonable doubt of his guilt for Kasavich's murder.

¶ 20     The State contends "all the evidence in this case pointed directly to [Trzeciak] and to no one else." Trzeciak counters that "the State makes this claim only by ignoring and misstating evidence and by urging inferences unsupported and contradicted by the record." We disagree.

¶ 21     In reviewing a sufficiency of the evidence claim, the question is whether, after viewing the evidence presented in a light most favorable to the State, any rational trier of fact could find all the essential elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 358 Ill. App. 3d 927, 941 (2005). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises reasonable doubt of the defendant's guilt. *Jackson*, 358 Ill. App. 3d at 941. The trier of fact sits in a superior position to assess the credibility of the witnesses, resolve inconsistencies and determine the weight to be given the testimony, as well as construe any reasonable inferences that fairly may be drawn. *Jackson*, 358 Ill. App. 3d at 941.

¶ 22     The evidence established that Kelle O'Nions found Kasavich dead in his trailer at 10 p.m. on June 29, 2004. At the time, O'Nions lived with Kasavich. O'Nions admitted in her testimony that she had been a cocaine addict for 20 years, but claimed not to be under the influence of cocaine at the time of trial.

¶ 23     O'Nions testified that she accompanied Kasavich on June 25, 2004, when he purchased a car from Richard Roethler in Hammond, Indiana, using a combination of cocaine and money. The following day, O'Nions and Kasavich went to Pennsylvania. When they returned on June 28, the car, which had been left at Kasavich's trailer, had vanished. The following morning, O'Nions and Kasavich went to Roethler's house, where they learned he had taken the car back. O'Nions testified she overheard Roethler and Kasavich argue about the car and cocaine. Kasavich left and O'Nions followed a short time later. She returned to Kasavich's trailer around 1 p.m. on June 29, the two argued. She left at his request, and when she did so, both Kasavich and his trailer were fine.

¶ 24     O'Nions went to a motel with a man before returning to Kasavich's trailer around 10 p.m. She testified she tried to enter the trailer from the front door, but a coffee table barred the door. After forcing her way in, she found Kasavich face up on the floor with blood over his face. O'Nions called the police from a neighbor's house.

¶ 25     O'Nions testified she knew Trzeciak and knew that Kasavich had bought crack cocaine from him in the past. She acknowledged that Kasavich bought cocaine from other people and she did not know how many people, if any, he owed for cocaine at the time of his murder.

¶ 26    Detective Kevin Eberle of the Chicago police department testified that when he spoke with O'Nions at the station, she was sobbing and upset. She had no blood on her clothing, no cuts on her hands, and no injuries to her face. Detective Eberle also interviewed Richard Roethler and concluded he was not a suspect in Kasavich's murder because he had no motive. Before the murder, Roethler had gotten the payment for the car (cash and cocaine) as well as his car back from Kasavich. Eberle testified the area of Chicago where the murder occurred, Hegewisch, is not an area with a high murder rate.

¶ 27    Patricia Madigan testified she became acquainted with Trzeciak through Barnas and did not know Kasavich. Madigan testified that in 2004 she was a crack addict, using it on a daily basis, but she claimed to have been clean for three to four years before trial. Madigan testified she called Trzeciak on the afternoon of June 29, 2004, for drugs. They arranged to meet at the intersection of 129th and Commercial around 1:30 or 2 that afternoon, but Trzeciak never showed. Madigan left and later arranged to meet Trzeciak at the same place at 4 p.m. Madigan arrived using Michael Lesko's car and saw Trzeciak walking down the street; Trzeciak got into the car with Madigan. Madigan testified Trzeciak's left arm was bandaged with a cloth that was full of blood. He told Madigan he had been in a police chase in Hammond and had cut himself on the glass in his truck. At trial, Chicago police detective Kevin Eberle testified Trzeciak's blue Ford pickup truck had no exterior damage and that none of the truck's glass was broken.

¶ 28    Madigan testified Trzeciak asked her if she had heard about a murder in the trailer court; she replied she had not. They made a drug delivery, then Trzeciak took over as the driver and they picked up Trzeciak's adult daughter. Trzeciak asked his daughter if she had heard anything about a murder in the trailer court; she replied she had not. The three of them went to Trzeciak's house and ate dinner. Trzeciak packed an overnight bag, but did not say why.

¶ 29    Madigan and Trzeciak drove to Lesko's house. Madigan testified she knew Lesko because she had done drugs at his house. Once there, Trzeciak asked Madigan to wash his clothes, cut his hair, and rebandage his arm. Madigan testified she had never cut Trzeciak's hair before. She observed the cut on Trzeciak's arm and described it as a puncture wound in the wrist area, which was fairly deep. As she used the drugs she got from Trzeciak, he got dressed in the clothes she had washed. They left Lesko's home and drove back to Trzeciak's house through the alley. Trzeciak entered his house by jumping over a fence.

¶ 30    Madigan waited in the car for 5 to 10 minutes for Trzeciak to return. When Trzeciak returned it was dark. He threw something over the fence that was wrapped in a blanket. Madigan testified "it looked to be like rifles or guns of some sort. *** You could see the butt of the one gun and the tip of where the bullet comes out." Trzeciak put the bundle in the trunk, and as he drove, he threw bullets out the window and had a pistol on his lap. They arrived at a landfill and Trzeciak gave Madigan crack cocaine. He told her to wait in the car and not to watch what he was doing. Trzeciak walked to the Calumet River and then Madigan heard a splash. When Trzeciak returned, he did not have the gun that had been on his lap. They drove to a baseball field and Trzeciak left Madigan there for 10 minutes. When Trzeciak returned, they headed to Barnas's house.

¶ 31    At Barnas's house, Trzeciak spoke privately to Barnas. Madigan smoked crack in the basement. Madigan heard Trzeciak ask Barnas if he could leave some things at his house. Trzeciak brought in the blanket bundle from the trunk; Madigan did not see what was in it. They all smoked crack in the basement and then Trzeciak and Madigan returned to Lesko's

home. When Madigan woke the next day, Trzeciak was gone, and so was Lesko's car. On July 28, Madigan contacted the police after learning of Kasavich's murder. She recounted the events in a handwritten statement.

¶ 32    Michael Lesko testified that in June 2004 he was a crack cocaine user, but at trial, he claimed he no longer used drugs. Lesko met Trzeciak through Barnas and was a good friend of Madigan's. He testified that on occasion, he lent out his white Oldsmobile, including to Madigan and Trzeciak. On June 29, 2004, sometime between 6 and 8 p.m., he was at his home in Whiting, Indiana, when Madigan and Trzeciak came in without warning. Lesko recalled Trzeciak's arm was bandaged with a cloth and blood stained the side of his shirt. Trzeciak claimed he injured himself after too many beers, fell down, and hit his arm. Trzeciak asked if he could use Lesko's bathroom to clean up. Trzeciak took a bath, which Lesko testified was unusual. Madigan washed all of Trzeciak's clothes, rebandaged his arm, and gave him a haircut. Lesko said this too was unusual. Lesko described Trzeciak's wound as small, about an eighth of an inch. The next morning, Lesko saw Madigan sitting on a chair in the front room talking with Trzeciak, who was in bed. Sometime that day, Trzeciak left in Lesko's car. When Lesko saw the car again a day or two later, the once dirty car (both inside and out), had been cleaned. Lesko did not know Kasavich.

¶ 33    The police interview of Lesko took several days. Lesko testified he did not feel like he was under pressure, but just that he was "being pushed a little too hard" to give information. The police tested Lesko's Oldsmobile for the presence of biological samples. A complete DNA profile of an unidentified female was found on the steering wheel.

¶ 34    Chicago police forensic investigators processed the crime scene shortly after 10 p.m. on June 29, 2004. They found Kasavich's trailer in disarray, indicating a struggle. The investigators recovered, from inside the trailer, three fired Smith & Wesson cartridge cases from a semiautomatic weapon and a live Smith & Wesson cartridge in the living room floor. They noted that the side window of the rear bedroom had been broken from the inside. No blood was found in that room. Outside the trailer below the window, the investigators found large shards of glass. The investigators recovered one piece of broken glass with blood on it from the roof of a small storage shed near the rear of the trailer. No blood was found on any other pieces of glass. Near the shed, the investigators recovered a lighter, keys to a Dodge or Chrysler, and a crack pipe.

¶ 35    DNA expert Nicholas Richert at the State Police crime lab extracted a DNA profile from the piece of glass recovered from the shed at the back of the victim's trailer. A mixture of DNA profiles was found on that piece of glass, in which there was a major human male DNA profile matching Trzeciak's profile, which would be expected to occur in 1 in 35 quadrillion black, 1 in 100 quadrillion white, and 1 in 83 quadrillion Hispanic unrelated individuals. The other DNA present on the glass shard was never identified; it did not match Kasavich's DNA.

¶ 36    At 3:40 p.m. on July 26, 2004, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and members of the Chicago police went to Daniel Barnas's home. (At the time of Trzeciak's trial, Barnas had died.) Barnas consented to a search of his home. The officers recovered a Glock Model 27 .40-caliber gun, which was tightly wrapped in two plastic grocery bags, from underneath a bedroom dresser and a prescription bottle with Kasavich's name in a basement cabinet. They also recovered a rifle from under the kitchen steps.

¶ 37      Federal authorities took possession of the Glock handgun and had the Illinois State Police crime lab test it. Crime lab firearms examiner Kris Rastrelli concluded the Glock handgun was used to kill Kasavich. The gun was returned to federal authorities and destroyed before trial, after Trzeciak's conviction for federal gun charges.

¶ 38      At trial, Trzeciak's estranged wife, Laura Nilsen, and her sister's boyfriend, Joseph Schillaci, reviewed photographs of the recovered Glock Model 27 handgun. Both testified they had seen Trzeciak in possession of that gun. Nilsen testified she had extensive experience with the gun because Trzeciak had repeatedly threatened her with it.

¶ 39      Nilsen testified she began dating Trzeciak in November 2003 and the two were married in January 2004. During their marriage, Trzeciak provided her with crack cocaine to support her daily habit and would beat her on a regular basis with his fists and a pistol, often accusing her of having extramarital affairs, including with Kasavich. Trzeciak used physical violence to try to force her to admit to having an affair. While she used to live with Kasavich, she denied ever having a romantic or sexual relationship with him. She admitted she used to smoke crack with Kasavich and knew Trzeciak sold crack to him.

¶ 40      Nilsen testified that on a night in April 2004, she received a phone call. She explained that whenever she received calls, Trzeciak would get angry and violent. That evening, Trzeciak hog-tied Nilsen with duct tape, put her in his blue Ford truck, and drove her to Kasavich's trailer, about five minutes away. There, Trzeciak beat her, while accusing her of trying to leave him for Kasavich. Trzeciak had his gun with him. Nilsen testified that while outside of Kasavich's trailer, Trzeciak said he was going to cut Kasavich's "dick off and put it in my mouth and kill us both." Trzeciak knocked on Kasavich's trailer door, but no one answered. Trzeciak drove home, where he continued to beat Nilsen and accuse her of cheating.

¶ 41      On the evening of June 24, 2004, Nilsen received a phone call from her sister and Trzeciak began to beat her while she was on the phone. She quickly hung up. Trzeciak left the house. In the early hours of June 25, the police arrived at their house and Nilsen went with them to a police station in Hammond. She was interviewed and photographed. The photographs show bruising on her face, arms, leg, and back. (The photographs of Nilsen were published to the jury.) Nilsen was taken to the hospital, treated and released. She testified she went into hiding after that day and never saw Trzeciak again. Police issued a warrant for Trzeciak's arrest on charges of domestic battery based on Nilsen's interview.

¶ 42      At trial, Nilsen was shown a photograph of the gun confirmed by ballistics testing to be the murder weapon. She testified the gun in the photograph was the gun Trzeciak used to threaten and beat her. She admitted she did not know the make or model of the gun, but knew that was the gun Trzeciak kept with him "all the time." She was also shown a photographic array of multiple, similar model weapons. Looking at it, she testified she was sure none of them were the gun Trzeciak kept. She could not identify which of the guns in the photograph were the same make and model as the gun Trzeciak carried. She admitted she told the police that Trzeciak abused her, but not about his threats to Kasavich.

¶ 43      Evidence was presented about Trzeciak's evasion of the police in a high-speed chase and a second incident in which he barricaded himself in his house after the police confronted him there. On July 22, 2004, Hammond police officer Matthew Porter went to Trzeciak's house to arrest him on the domestic battery warrant. Shortly afterwards, Porter saw Trzeciak back a blue Ford Bronco out of his driveway and drive across the street to a gas station. Officer

Porter pulled into the station behind Trzeciak's car and saw Trzeciak by a gas pump. Trzeciak jumped back into the Bronco and drove off. Officer Porter turned on his lights and siren; Trzeciak did not stop. A pursuit ensued through alleys and streets. As Trzeciak headed into Chicago, Porter's superiors called off the pursuit.

¶ 44   A few days later, on July 26, Porter saw a van pull into Trzeciak's driveway driven by a female with Trzeciak in the passenger seat. Officer Porter ordered the occupants to stay in the van and called for back-up assistance. Trzeciak opened his door and began yelling at the officer. Trzeciak then appeared at the front of the van, leaned over the hood, and pointed a silver pistol at the officer. Trzeciak moved around the van, keeping the female driver between him and the officer, before running into his house. SWAT team officers arrived and a standoff followed. The police shot tear gas into every window of the house and when no one came out, pried open the rear screen, and knocked the door down with a battery ram. The officers found Trzeciak in the basement pointing a silver pistol at them. He was apprehended and arrested. At the time, the officers knew Trzeciak to be a drug dealer and that there was a warrant out for his arrest for domestic violence and resisting arrest. Federal and local law enforcement recovered a .45-caliber handgun during their search of Trzeciak's home.

¶ 45   Additional physical evidence at trial included fingernail scrapings found under Kasavich's fingernails. The DNA testing of those scrapings excluded Trzeciak and Richard Roethler as contributors.

¶ 46   Trzeciak called John Riggio to testify. Riggio, the manager of a south suburban gun shop bought, sold, and traded guns since 1967. He testified he was familiar with the size, shape, and appearance of Glock pistols having seen thousands of them. He testified the .40-caliber Glock pistol and 9-millimeter Glock pistol have an identical body and frame.

¶ 47   Because the State's case was based on circumstantial evidence, we must consider whether the evidence as a whole could have satisfied the jury of defendant's guilt beyond a reasonable doubt.

¶ 48   Trzeciak insists the State's evidence was weak and so unreasonable, unsatisfactory, or improbable as to leave reasonable doubt of his guilt. He takes particular issue with the evidence relating to motive and opportunity, arguing it is just as strong for other individuals. Trzeciak points to the lack of direct physical evidence connecting him to the crime as a basis to negate the jury's finding of guilt.

¶ 49   He argues that his DNA on the shard of glass found on the shed outside Kasavich's trailer does not link him to the shooting. The shard had both Trzeciak's DNA and that of another, unidentified male. Additionally, although a window nearby had been broken, no evidence linked the recovered shard of glass to that window. Moreover, Trzeciak argues that contrary to the State's assertion, Madigan's testimony does not link him to the murder weapon found in Barnas's house. No witness testified that Trzeciak took the murder weapon to Barnas's house–a house full of guns. Madigan testified that long guns were in the bundle Trzeciak placed in the car, not handguns. The only handgun Madigan saw Trzeciak with was the one that disappeared after they stopped and she heard a splash. Trzeciak maintains that the only witness linking the murder weapon to him was Nilsen, but she was impeached when she could not point to any particular distinguishing characteristics of his gun and her acknowledgment that the photographs of the other guns looked like the murder weapon.

¶ 50   As to the small puncture wound, Trzeciak contends it is inconsistent with the violent struggle that occurred in Kasavich's trailer. He also contends his behavior does not support

the inference the State suggests. The act of moving long guns to Barnas's house does not implicate him in the murder because the murder weapon was not a rifle. And cutting his hair "could just as easily be completely innocuous or, at most, relate to concern about being identified after the drug transaction he participated in that day." On motive, Trzeciak contends the fight he had with Nilsen in which he threatened to kill her and Kasavich took place two months before Kasavich was shot, whereas Roethler had a heated argument with Kasavich about a car and a large amount of cocaine just hours before the shooting.

¶ 51    Viewing the evidence as a whole, we reject Trzeciak's challenge to the sufficiency of the evidence. The jury could properly base its decision on inferences derived from the evidence. See *People v. McDonald*, 168 Ill. 2d 420, 447 (1995) ("When weighing the evidence, the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.").

¶ 52    The evidence showed Trzeciak often accused Nilsen of having an extramarital affair with Kasavich and would try to beat a confession out of her. Two months before Kasavich's murder, Trzeciak drove Nilsen to his trailer, put a gun in her mouth, and threatened to kill her and Kasavich. On June 24, 2004, Nilsen left the house after another incident of domestic abuse. The jury, based on Trzeciak's prior abuse of Nilsen because he believed she was having an affair with Kasavich, could reasonably have inferred that Trzeciak assumed Nilsen was with Kasavich, prompting another jealous rage. Further, Trzeciak acted strangely in the hours immediately after the murder. He bathed, cut his hair, and changed his clothes at Lesko's house. He entered his own house by jumping a fence and returned with an overnight bag and, later, a bundle of guns. He drove around throwing bullets out the window and then stopped to throw something in the river. Trzeciak asked Barnas if he could leave some items at his house and then entered with the bundle of guns. The murder weapon was found at Barnas's house. Both Schillaci and Nilsen testified they had seen Trzeciak with the murder weapon. We agree with the State that it is "highly incriminating" that during the afternoon of June 29, Trzeciak asked if anyone had heard of a murder in the neighborhood, when the police did not find out about the murder until that night. Trzeciak's flight was also important and proper evidence of his guilt (which we will discuss in greater detail). The jury properly considered all of the evidence, assessed the credibility of the witnesses and resolved any conflicts in their testimony. *Jackson*, 358 Ill. App. 3d at 941. Reviewing courts do not retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 53    When viewed in a light most favorable to the State, the evidence could properly allow a rational trier of fact to find Trzeciak guilty beyond a reasonable doubt of first-degree murder. We affirm Trzeciak's conviction.

¶ 54                              Personally Discharging the Firearm

¶ 55    Trzeciak argues the State failed to offer any evidence supporting the finding that he personally discharged the firearm that killed Kasavich. The police found the murder weapon at Barnas's house, however, no evidence links it or the cartridge casings found at Kasavich's trailer to Trzeciak. There was no evidence placing Trzeciak inside Kasavich's trailer, despite evidence of a violent struggle which resulted in significant physical injuries to Kasavich and damage to the room.

¶ 56    The jury convicted Trzeciak of first-degree murder, which required the State to prove that Trzeciak, with the intent to kill an individual, performed an act which constituted a substantial step toward the killing of the individual. 720 ILCS 5/9-1(a)(2) (West 2004). Additionally, the sentence enhancement in section 8-4(c) of the Criminal Code of 1961 (Code) (720 ILCS 5/8-4(c)(1)(D) (West 2004)) required the State to prove that during the commission of the murder, Trzeciak personally discharged a firearm.

¶ 57    The State bears the burden of establishing beyond a reasonable doubt the facts qualifying a defendant for a statutory sentencing enhancement. *People v. Thurow*, 203 Ill. 2d 352, 360 (2003). When presented with a challenge to the sufficiency of evidence on an enhancement, we consider the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found that factor was established beyond a reasonable doubt. *People v. Lavelle*, 396 Ill. App. 3d 372, 382 (2009).

¶ 58    As discussed, Trzeciak challenged the sufficiency of the evidence by arguing the State failed to prove every element of first-degree murder. "Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Gomez*, 215 Ill. App. 3d 208, 216 (1991). The State offered sufficient circumstantial evidence for a reasonable trier of fact to find Trzeciak personally discharged the firearm. See *People v. Campbell*, 146 Ill. 2d 363, 380 (1992) ("It is not necessary *** that the jury be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all the evidence taken together satisfies the jury beyond a reasonable doubt of the accused's guilt. [Citation.] Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from evidence before it [citation] ***." (Internal quotation marks omitted.)). We reject Trzeciak's contention that the only reasonable inferences to be drawn from the evidence undermine the State's theory that he committed the offense. The inference that Trzeciak fired the gun that killed Kasavich flows logically from the facts. Kasavich was shot to death. Trzeciak had previously threatened to kill Kasavich. Trzeciak's DNA was found at the scene of the crime, albeit outside. Trzeciak left a bundle of guns at Barnas's house. Police found the murder weapon at Barnas's house. Two witnesses identified the murder weapon as having been in Trzeciak's possession. Trzeciak inquired about the murder before the police even became aware of it. Following the murder, Trzeciak fled from the police on two separate occasions.

¶ 59    Viewing all of the evidence in a light most favorable to the State, the jury could reasonably conclude, beyond a reasonable doubt, that Trzeciak personally discharged the firearm that killed Kasavich. The evidence supports the jury's finding that Trzeciak personally discharged the firearm during the commission of the offense and the trial court's application of the 40-year firearm enhancement.

¶ 60                                Evidence of Flight

¶ 61    The trial court allowed the State to introduce two instances of Trzeciak's flight from Hammond police trying to apprehend him on a domestic battery warrant, including the SWAT-involved standoff at his home. Trzeciak argues this evidence improperly allowed the jury to hear irrelevant and prejudicial information designed to make them believe he was a dangerous person and conclude he was guilty of Kasavich's murder in Chicago. In addition, he argues, the record contains substantial evidence that he resisted police for various reasons other than the Kasavich murder, making the evidence of his flight inadmissible for the

purpose of inferring guilt for the Kasavich murder and, therefore, the trial court abused its discretion in allowing the evidence.

¶ 62 Trzeciak contends the State never linked his flight from the Hammond police to Kasavich's murder–no evidence indicated Trzeciak knew he was a suspect in the murder or that he believed the Hammond police sought his arrest for a crime that happened in Chicago. According to Trzeciak, the State's evidence showed he had other, more likely, reasons to attempt to evade the Indiana police, including his regular possession and sale of crack cocaine, his possession of firearms, and the alleged physical abuse of his estranged wife for which there was an outstanding warrant.

¶ 63 Trzeciak points to Nilsen's testimony that he was always worried about the police coming to his house because he kept crack cocaine there. Also, the ATF was investigating his firearms possession, which is why ATF agents arrived at his home with a federal search warrant after the Hammond SWAT team secured it. Additionally, one of Trzeciak's instances of flight involved him driving from Indiana to Illinois, an action he argues does not indicate he knew he was suspected of committing a crime in Illinois, and both instances involve him trying to evade Hammond, not Chicago, police.

¶ 64 "The fact of flight, when considered in connection with all other evidence in a case, is a circumstance which may be considered by the jury as tending to prove guilt. [Citation.] The inference of guilt which may be drawn from flight depends upon the knowledge of the suspect that the offense has been committed and that he is or may be suspected." *People v. Lewis*, 165 Ill. 2d 305, 349 (1995). "While evidence that a defendant was aware that he was a suspect is essential to prove flight, actual knowledge of his possible arrest is not necessary to render such evidence admissible where there is evidence from which such fact may be inferred." *Id.* at 350. We review the admission of evidence using an abuse of discretion standard. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 65 We agree with the State that Trzeciak's reliance on *People v. Harris*, 23 Ill. 2d 270 (1961), and *People v. Hayes*, 139 Ill. 2d 89 (1990), is misplaced. In those cases, no evidence existed from which the jury could reasonably infer the defendant knew he was a suspect and was consciously trying to avoid the police. The evidence presented here, though, properly supports an inference of knowledge. Twice Trzeciak tried to avoid uniformed police in a marked squad car. Moreover, Trzeciak's actions and statements in the hours after the murder offer a reasonable basis from which one can conclude he knew he could be a suspect. Trzeciak asked both Madigan and his daughter if they had heard about a murder in the trailer park, he engaged in unusual activity, including washing his clothes, bathing, and cutting his hair, and he drove home through a dark alley and entered and exited by jumping over a fence. Then there is his packing an overnight bag and driving around disposing of items he had retrieved from his house, including dropping off items wrapped in a blanket at Barnas's house. Based on this evidence, the jury could reasonably infer Trzeciak knew the police could be looking for him as a suspect in Kasavich's murder.

¶ 66 Trzeciak argues the record contains evidence he may have resisted arrest because he feared arrest for his drug dealing, weapon possession, or domestic abuse of his wife. But, that evidence does not make his proffered conclusion more likely than one in which he knew he was wanted for Kasavich's murder. Additional reasons for his flight, *i.e.*, the other crimes, do not negate the evidence that supports a reasonable conclusion that Trzeciak knew he could be a murder suspect when he fled. Accordingly, we find no abuse of discretion in the trial

- 12 -

court's admission of the flight evidence.

¶ 67                                Other-Crimes Evidence

¶ 68      Next, Trzeciak argues the trial court's decision to allow the State to elicit testimony from Nilsen detailing Trzeciak's alleged abuse of her effectively presented the jury with prejudicial other-crimes evidence, depriving Trzeciak of a fair trial.

¶ 69      The trial court did not allow the State to use all of the domestic abuse evidence it sought to introduce, but the trial court did allow Nilsen to testify about the daily beatings, accusations of her having an affair with Kasavich, and the threat to kill both of them, finding the evidence showed motive and intent.

¶ 70      Trzeciak argues Nilsen's testimony about the beatings was not relevant to Trzeciak's motive or intent to kill Kasavich and, besides, was highly prejudicial. In sum, he argues the evidence portrays him as a bad person–a wife beater–persuading the jury to convict him of Kasavich's murder on that reason alone.

¶ 71      The admissibility of other-crimes evidence falls within the sound discretion of the trial court, and we review it under an abuse of discretion standard. *People v. Boand*, 362 Ill. App. 3d 106, 122 (2005). An abuse of discretion occurs when the trial court acts arbitrarily or fancifully, or where no reasonable person would take the view adopted by the trial court. *Boand*, 362 Ill. App. 3d at 122.

¶ 72      In Illinois, well-settled law allows evidence of other crimes if relevant for any purpose other than to show the defendant's propensity to commit crimes, including, but not limited to, motive and intent. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). This type of evidence will not be permitted, however, if its prejudicial effect outweighs its probative value. *Dabbs*, 239 Ill. 2d at 284.

¶ 73      The trial court made extensive rulings on this issue after hearing testimony from the detective who interviewed Nilsen in July 2004, as well as viewing Nilsen's videotaped statement to the police. The court also considered the parties' written motions, which detailed the evidence and case law.

¶ 74      Our review of the record shows the trial court carefully considered each piece of evidence, including whether its probative value outweighed its prejudice. In doing so, the trial court prohibited the State from introducing all of the evidence it wanted. We find the other-crimes evidence allowed by the trial court related directly to the issue of motive and intent and, therefore, was properly admitted. The evidence of Trzeciak's physical abuse of his estranged wife directly relates to Trzeciak's jealousy of Nilsen's relationship with Kasavich. Because we cannot say the trial court's decision was arbitrary or that no reasonable person would take the same view, we hold the trial court's decision to admit the other-crimes evidence was not an abuse of discretion.

¶ 75                                Jury Selection

¶ 76      Trzeciak argues, for the first time on appeal, that he was denied a fair trial when the trial court interfered with the selection of an unbiased jury by ordering the first juror who stated that a family's member's prior experience with the criminal justice system might prevent him from being fair to "sit here and come back every day of the trial and watch how a fair jury operates." Trzeciak contends the court's reaction to the prospective juror's professed bias

could have discouraged the remaining prospective jurors from responding honestly to questions regarding their ability to be fair and impartial.

¶ 77 Trzeciak acknowledges he failed to object at trial but argues he did not forfeit review of this issue because, as this court has acknowledged, "[t]he waiver rule is relaxed when the conduct of the judge is at issue due to 'the fundamental importance of a fair trial and the practical difficulties involved in objecting to the conduct of the trial judge.' " (Internal quotation marks omitted.) *People v. Zapata*, 347 Ill. App. 3d 956, 964 (2004) (quoting *People v. Brown*, 200 Ill. App. 3d 566, 575 (1990)). Trzeciak did include his claim of error in his posttrial motion. We, thus, turn our attention to the merits of this claim.

¶ 78 The following colloquy took place between the trial court and the prospective juror:

"THE COURT: Have you or someone close to you ever been arrested or charged with any crime other than a traffic offense, even if that case was dismissed?

A. [Prospective Juror:] Yes.

Q. Who was that, sir?

A. My wife's first cousin.

* * *

Q. What was the nature of the offense?

A. Shot at an off-duty officer.

* * *

Q. Is there anything about that that would make you unable to be fair to either side here?

A. Possibly.

Q. What does that got to do with this case, sir?

A. I would have to hear the case.

Q. I don't understand. Who would you be unfair to here because of something that happened to a cousin of your wife?

A. Well, I'm just answering it as you stated it to me.

Q. Who are you not going to be fair to based on something that happened to someone else ten years ago that you didn't witness? I don't understand.

A. I guess the prosecutor.

Q. You are not excused. You will sit here and come back every day of the trial and watch how a fair trial operates. You can sit back there and come back every day of the trial under my direct order. Sit in the back.

[Prospective Juror]: Out here?

THE COURT: You are not excused. You will be back every day."

¶ 79 After the parties conducted in-chambers discussions about the panel, the court excused several jurors, but added:

"With the exception of the gentleman who will be coming everyday to the trial to view how a trial is conducted, the rest of you are excused with our thanks for your willingness to serve. Have a nice night. The other man will remain."

¶ 80 In the presence of the remaining venire, the following colloquy occurred:

"[Prospective Juror]: I still have to wait?

THE COURT: Yes, you do. You will be here every single day.

[Prospective Juror]: I want to know for Monday the same time?

THE COURT: I don't know. I'll let you know when I leave. You are not leaving yet."

¶ 81 Trzeciak argues the trial court frustrated the purpose of *voir dire* by suggesting that if another venire person disclosed an inability to be fair, that person would have to return to court to observe a trial. Trzeciak argues the court's conduct "intimidated prospective jurors into concealing bias or prejudices that would have legitimately disqualified them from jury service." According to Trzeciak, the court's "threat of punishment" abrogated its duty to ensure he received a fair and impartial trial and deprived him of an informed and intelligent basis on which to challenge prospective jurors.

¶ 82 Nothing in the record before us supports concluding that any impaneled juror was not impartial. As our supreme court held in *People v. Lewis*, 165 Ill. 2d 305, 344 (1995), "even assuming an irregularity in the selection of jurors, reversal is not required unless it appears that the defendant has in some way been prejudiced." Moreover, the trial court's conduct is similar to that of the trial court in *People v. Brown*, 388 Ill. App. 3d 1 (2009), which found no error in the jury selection process. There, the court determined the issue forfeited because the defendant failed to meet the second prong of the plain error doctrine where no evidence in the record indicated that the jury was actually biased. *Brown*, 388 Ill. App. 3d at 11. Justice Wolfson authored a special concurrence finding the trial court's comments were not in error, while Justice Gordon dissented, finding reversible error. *Brown*, 388 Ill. App. 3d at 11-15 (Wolfson, J., specially concurring and Gordon, J., dissenting).

¶ 83 The *Brown* court found that despite the unnecessary exchange by the court with a dismissed prospective juror in the presence of the venire, the *voir dire* procedure used by the trial court did not deprive the defendant of a fair trial because the defendant had an opportunity to sufficiently question the prospective jurors to select a fair and impartial jury. *Brown*, 388 Ill. App. 3d at 11. The court would not speculate as to whether the remaining prospective jurors were intimidated into not revealing any bias by the trial court's reaction to the first prospective juror. *Brown*, 388 Ill. App. 3d at 10-11. The claimed error by the defendant was forfeited. *Brown*, 388 Ill. App. 3d at 11. But, the court called into question the trial court's need to engage in an admonishment of the prospective juror in the presence of the venire. A more appropriate response, should the trial court see a need to instruct a prospective juror on his or her civic duty to serve on a jury, would be to require the juror to remain until the end of the proceedings that day and speak to him or her privately, outside the presence of the remaining prospective jurors. *Brown*, 388 Ill. App. 3d at 5.

¶ 84 Consistent with our holding in *Brown*, while we do not condone the manner of the exchange between the trial court and the prospective juror, we reject Trzeciak's contention that the trial court's conduct affected his right to a fair trial. His contention rests on nothing more than speculation, and contrary to his contention, throughout the *voir dire* process, multiple prospective jurors informed the court that based on their personal circumstances they had certain biases, but all stated they could still be fair. Most telling is the fact that defense counsel did not object to the swearing of the jury, which indicates to us counsel believed the jury as impaneled could be fair and impartial.

¶ 85 As an aside, the *Brown* decision urged the end of this practice, particularly where there is an easy alternative, *i.e.*, a private discussion with the prospective juror claiming bias. As we

stated in *Brown*, of utmost importance in the jury selection process is the ability of each prospective juror to be honest in his or her responses. "It is precisely that 'frank' exchange between the prospective juror and the questioner that is the primary objective of *voir dire*. Anything that might reduce that frank exchange should be avoided." *Brown*, 388 Ill. App. 3d at 5. In light of Justice Gordon's dissent in *Brown*, we recognize the possibility that a trial court's method of "educating" a prospective juror on civic duty may impede the selection of an impartial jury, but do not find this case to be such an instance.

¶ 86                                      Lay Opinion Testimony

¶ 87    Trzeciak next argues the trial court committed reversible error when it refused to allow defense witness John Riggio to offer lay opinion testimony concerning the similarity of multiple models of guns to the murder weapon. The State responds that Riggio's proposed testimony was irrelevant and, alternatively, that any error in omitting it was harmless.

¶ 88    After the State rested, the defense called Riggio. The State objected, or alternatively, sought to question Riggio about selling guns to gang members and protests that took place in front of his store. Following a discussion in which the trial court stated it would not consider Riggio an expert, the court ruled the State could ask about gun sales to gang members, but not the protests. The court further held that the defense could not elicit an opinion from Riggio about whether the guns in the defense's demonstrative photographs were of like character to the murder weapon.

¶ 89    Trzeciak argues Riggio's testimony would have assisted the jury in determining an ultimate fact at issue, *i.e.*, whether the State could credibly link the murder weapon to him. Trzeciak claims Riggio's proposed opinion would have detailed the similarities between the murder weapon and other handguns and provided the jury with an opinion that was useful in deciding whether the gun was distinguishable from other similar makes and models.

¶ 90    The admission of evidence falls within the sound discretion of a trial court and, as a reviewing court, we will not reverse the trial court's decision absent an abuse of that discretion. *People v. Hall*, 195 Ill. 2d 1, 20-21 (2000). Lay opinion testimony, like all other evidence, must be relevant to be admissible. *People v. Owens*, 372 Ill. App. 3d 616, 622 (2007). "[O]ne of the tests that a trial court may use when evaluating relevance is to ask how it would view the evidence if it were the trier of fact. That is–would the proposed evidence assist the court in resolving questions of fact? If not, then the evidence should be excluded." *Owens*, 372 Ill. App. 3d at 622 (citing *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574 (2002)).

¶ 91    We agree with the State that in light of the evidence presented, Riggio's proposed testimony was irrelevant and, thus, properly excluded. Defense counsel indicated to the trial court it wanted to call Riggio to ask: (i) if Glock makes any other firearms with an identical body to the murder weapon; and (ii) how many guns of roughly the same size, color, and shape Riggio sells at his store. Defense counsel also intended to show Riggio the photographs he had shown to Nilsen and Schillaci to ask if any of the depicted guns appeared to be the same size and shape as the murder weapon. Defense counsel informed the court Riggio would not be giving an expert opinion. The court questioned defense counsel on the relevancy of Riggio's testimony. Defense counsel replied, "[i]t is relevant because it allows the jury to get a sense for how common this size of gun–size and shape of the gun is." After further discussion, in which defense counsel indicated Riggio was not being offered as an expert, the court ruled that because defense counsel did not want to tender Riggio as an

expert, "[h]is opinion as to whether the murder weapon looks like other guns unrelated to the case is irrelevant." Ultimately, the court allowed Riggio to testify that he manages a gun shop, sells guns, and has seen other guns that look like a Glock, *i.e.*, the murder weapon.

¶ 92    Joseph Schillaci testified that in the summer of 2004 he was living with Nilsen's sister, his girlfriend. When Nilsen would visit them, Trzeciak would come too. At some point in 2004, Trzeciak tried to sell Schillaci a gun and showed him a black, bulky, thick gun that Trzeciak said was an old German Luger. Schillaci testified he had never seen a gun like it before. After examining a photograph identified as the murder weapon, he said it looked "very similar" to the gun Trzeciak had shown him. Schillaci was also shown a photograph of three different guns by defense counsel. Schillaci testified that all three of them looked the same as the gun Trzeciak had shown him in 2004.

¶ 93    Nilsen identified the photograph of the murder weapon as the gun Trzeciak hit her with, saying Trzeciak "had that gun all the time." She could not recall the make or model of the gun. When she was shown photographs of three different guns, she testified that all three looked similar to the gun Trzeciak hit her with, but she could "tell those ain't it." She was then shown a photograph of six other guns and could not identify which were the same make and model as the murder weapon.

¶ 94    Riggio testified that he is the manager of Chuck's Gun Shop in Riverdale, where he buys, sells and trades guns. He testified he has worked there since 1967 and is familiar with the shape, size, and appearance of handguns. He said he has seen thousands of Glock handguns and was familiar with the Glock Model 27's appearance. Riggio testified that Glock makes a Model 26 9-millimeter gun, which has an identical body to the Glock Model 27.

¶ 95    Defense counsel wanted to ask Riggio if the gun shown in the murder weapon photograph, a Glock Model 27, looked like other guns with which Riggio was familiar. The question of whether something looks like something else is not a question that calls for either a lay or expert opinion. Schillaci and Nilsen had already been asked that question when they were shown the photographs depicting different guns. Both witnesses testified that the different guns they saw all looked similar to the murder weapon. Their opinion that the gun depicted in the photograph of the murder weapon, which they both testified they saw Trzeciak possess, was similar to the other makes and models of guns they were shown, was the relevant evidence, not whether Riggio also opined the same. Through Nilsen's, Schillaci's and Riggio's allowed testimony, the defense was able to make its point to the jury that the murder weapon, a Glock 27, was not unusual or unique.

¶ 96    We hold the trial court properly exercised its discretion in limiting Riggio's trial testimony. Riggio's testimony was not necessary for the defense to make its argument that the similarity of the murder weapon to other makes and models of guns and, therefore, it was irrelevant. The trial court's limit of Riggio's testimony did not frustrate defense counsel's ability to rebut the State's evidence.

¶ 97    The trial court properly considered the necessity and relevance of Riggio's testimony in light of the facts and properly exercised its broad discretion to determine the admissibility of Riggio's testimony, balancing its probative value against its prejudicial effect. We find no error in the court's decision to limit Riggio's testimony as it did.

¶ 98                                    Sentencing

¶ 99        Trzeciak argues his sentence was excessive, claiming the trial court failed to consider the mitigating factor of his mental health issues in sentencing him to 90 years' imprisonment.

¶ 100       As Trzeciak concedes, this issue has been waived. Challenges to defects in a sentencing hearing must be included in a motion for a new sentencing hearing to avoid forfeiture. *People v. Pasch*, 152 Ill. 2d 133, 216 (1992). Trzeciak waived this issue by failing to object at the sentencing hearing and failing to raise the issue in a motion to reconsider. See *People v. Burt*, 168 Ill. 2d 49, 69 (1995).

¶ 101       The trial court's sentencing determination is entitled to great deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence and to balance the need to protect society with the rehabilitation potential of the defendant. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). As a reviewing court, we cannot substitute our judgment for that of the sentencing court just because we would have weighed the factors differently. *Stacey*, 193 Ill. 2d at 209. Furthermore, the existence of mitigating factors does not automatically require the sentencing court to reduce the sentence from the maximum. *People v. Powell*, 159 Ill. App. 3d 1005, 1011 (1987).

¶ 102       But, even where the sentence imposed is within the statutory range, we will find an abuse of discretion and reduce the sentence when it is "greatly at variance with the purpose and spirit of the law." *People v. Center*, 198 Ill. App. 3d 1025, 1032 (1990). All penalties are to be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. *People v. Moss*, 206 Ill. 2d 503, 520 (2003). The trial court's decision will not be disturbed absent an abuse of discretion. *People v. Streit*, 142 Ill. 2d 13, 19 (1991).

¶ 103       The trial court chose a sentence authorized by law for the offense of first-degree murder. The 50-year sentence Trzeciak received fell within the statutory range for which he was eligible. The jury also found he personally discharged the firearm which caused Kasavich's death, an enhancement from which he could receive 25 years to natural life. 730 ILCS 5/5-8-1 (West 2004). Trzeciak received 40 years. The record shows the sentencing court considered both the aggravating and mitigating factors presented during the sentencing hearing, including Trzeciak's criminal history. The sentencing court found the nature of the offense supported the sentence. We agree.

¶ 104       We find the sentence Trzeciak received to be proportionate to the serious nature of the offense he committed and consistent with the purpose of the law, including the balancing of the seriousness of the offense with Trzeciak's rehabilitative potential. We find no abuse of discretion in sentencing.


¶ 105                                     Mittimus

¶ 106       Lastly, Trzeciak contends, and the State concedes, that his mittimus should be corrected to reflect a single conviction of first-degree murder. Accordingly, under authority of Illinois Supreme Court Rule 615(b)(1), we order Trzeciak's mittimus be corrected to accurately reflect his conviction: one count of first-degree murder. See *People v. Blakney*, 375 Ill. App. 3d 554, 560 (2007) (where wrong offense listed, this court may order corrected mittimus to reflect actual offense of conviction).

¶ 107                                       CONCLUSION

¶ 108          Affirmed; mittimus corrected.